Patrick Mause (AZ Bar No. 024269)
Law Office of Patrick Mause, PLLC
1830 East Broadway, Suite 124-302
Tucson, AZ 85719
Ph: 520.342.0000
Email: Patrick@PMauseLaw.com

Attorney for Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Sabrina Franklin, an individual, | Case No.: |
| Plaintiff, | **COMPLAINT:** |
| vs. | **ERISA-GOVERNED LONG-TERM DISABILITY BENEFITS** |
| Hartford Life and Accident Insurance Company, | |
| Defendant. | |

For her Complaint, plaintiff Sabrina Franklin ("Franklin" or "Plaintiff") alleges as follows:

### PARTIES, VENUE, AND JURISDICTION

1.     At all material times, Franklin was a resident and citizen of Pima County, Arizona.

2.     Defendant Hartford Life and Accident Insurance Company ("Hartford") is a foreign insurance company authorized to do business in Pima County, Arizona and which was doing business in Pima County, Arizona.

3.     Franklin's claims are for long-term disability ("LTD") benefits, and any other benefits or relief which are available to her under her employer's ERISA-governed employee welfare benefit plan (the "Plan"). *See* Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*

4.    At all material times, Franklin was covered under the Plan in Pima County, Arizona through her employment with El Rio Health Center in Pima County, Arizona.

5.    The Court has jurisdiction under ERISA, 29 U.S.C. § 1132(e).

6.    Venue is proper in this District pursuant to 29 U.S.C. § 1132(e) and 28 U.S.C. § 1391 because the breaches of the DPC plan occurred in Pima County, Arizona, and because Hartford and the Plan may be found in Pima County, Arizona.

**FRANKLIN'S LONG-TERM DISABILITY PLAN**

7.    Franklin's LTD plan provides Franklin with income replacement in the event of her disability.

8.    Franklin's LTD plan was provided to her through her employment with El Rio Health Center ("El Rio"), which is a "Participating Employer" under the policyholder organization, Trustee of the Health Care Industry Group Voluntary Life and Disability Insurance Trust (the "Policyholder").

9.    The LTD plan provides disability benefits for employees who are "Totally Disabled" and partial disability benefits for employees who are "Disabled and Working."

10.    The LTD plan defines "Totally Disabled or Total Disability" to mean the employee is prevented from performing the "Essential Duties of Your occupation, and as a result, You are earning less than 20% of Your Pre-disability Earnings…"

11.    The LTD plan defines "Disabled and Working" to mean the employee is prevented "from performing some, but not all of the Essential Duties of Your Occupation, [You] are working on a part-time or limited duty basis, and as a result, Your Current Weekly Earnings are more than 20%, but less than or equal to 80% of Your Pre-disability Earnings."

12.     Prior to being covered under the Hartford-issued LTD plan in January 2017, Franklin was covered under the "Prior Plan" issued to her employer by Sun Life Assurance Company of Canada.

### FRANKLIN BECOMES DISABLED, HAS TO FIGHT HARTFORD FOR HER BENEFITS, AND HARTFORD EVENTUALLY PAYS HER FOR TWO YEARS

13.     In December 2017, Franklin was pregnant and working as a pharmacist for El Rio when she experienced severe pain and fatigue. She also experienced episodes of vision loss, dizziness, and syncope due to a pituitary brain hemorrhage that occurred in November 2017.

14.     Because she was unable to work, Franklin applied for short-term disability ("STD") benefits with Hartford, which Hartford approved.

15.     In March 2018, Hartford terminated Franklin's STD benefits based on the review of an in-house nurse "medical case manager."

16.     Franklin appealed Hartford's STD termination and Hartford sent her claim for review by Dr. Charles Brock, who is board certified in neurology and pain medicine. In his review, Dr. Brock noted his findings, among other things, that:

a.  He spoke with Franklin's attending primary care physician, Dr. David Kahan, who "reported the insured has headaches frequently and when they occur she needs to rest in a dark place and take analgesics. Her headaches were reported to be mildly improved but still occurring frequently."

b.  "As of 12/17/2017 to present and beyond, the available medical records reflect the insured is supported for restrictions and limitations."

c.  "The available medical records reflect the insured was having headache about once a week that was lasting several days. She would have light sensitivity, noise sensitivity, and she was also

noted to have complaints of mental fogginess, confusion, which would be attributable to the medication she was on."

d. "The medical records do not support the insured would be able to sustain work of 40 hours per week. The available medical records reflect the insured was recommended to return to work 20 hours per week per the provider starting in August 2018 at which point she was improved with her symptoms."

e. "Physical activity is a known aggravator of migraine headaches."

f. "The insured needs to be able to rest typically in a quiet, darkened room in order to get relief of headaches. As such when migraine headache is occurring, the insured would not be able to function in a vocational environment."

g. "The headaches are also unpredictable in regards to nature of onset and/or duration. Although available medical records indicate the insured was experiencing headache several days per week, as such one would not be able to reliably predict what hours of what days per se the insured might work."

h. "As noted these headaches are aggravated by physical activities and typically the insured would be taking analgesics and be in a quiet, dark room when such headaches occur."

i. "These findings would support that the insured be recommended for those restrictions and limitations for the noted time period of 12/27/2017 forward to 08/20/2018; when the insured was noted to be improved and the qualities of her condition from 08/20/2018 forward to the present. For the last three months, the insured was recommended for the ability to work up to 20 hours per week."

4

17.    Based on Dr. Brock's review, and by letter dated February 15, 2019, Hartford reversed its previous STD denial. Hartford therefore paid Franklin the full 26 weeks of STD benefits she was entitled to receive.

18.    Also on February 15, 2019, and also based on Dr. Brock's review, Hartford approved Franklin's LTD claim.

19.    Because Franklin had been forced to work excess hours in January 2019, Hartford turned around and denied her LTD claim on February 27, 2019 because she had earned "more than 80% of your Indexed Pre-Disability Earnings" in January 2019. Therefore, Hartford stated, her benefits were "terminated as of 01/01/19."

20.    In March 2019, Franklin's income declined back below the 80% income threshold to receive partial disability benefits. Hartford therefore reanalyzed her claim and approved LTD benefits "as of 03/01/2019." As Hartford further noted, because her prior period of total disability under the LTD plan ended December 31, 2018, and because her new period of disability began March 1, 2019 "due to the same or a related cause, we are able to reinstate benefits without applying a new Elimination Period."

21.    Following its March 2019 approval, Hartford periodically reviewed Franklin's claim, confirmed she remained unable to work full time, and approved her claim for ongoing partial disability benefits.

### HARTFORD WRONGFULLY TERMINATES FRANKLIN'S LTD BENEFITS IN FEBRUARY 2021, SHE APPEALS, AND HARTFORD DENIES HER APPEAL BASED ON THE REVIEWS OF OTHER ALLEGEDLY "INDEPENDENT" PHYSICIANS (BUT NOT DR. BROCK, OF COURSE)

22.    In August 2020, Hartford asked Franklin's attending primary care physician, Dr. Kahan, to complete an attending physician's statement ("APS") regarding Franklin's claim.

23.    In his APS, Dr. Kahan noted that Franklin could only sit, stand, or walk intermittently; that she was limited to lifting 15 pounds and only on an

occasional basis; that her restrictions and limitations ("R&Ls") were "indefinite"; and that her condition was "unchanged." He also noted that her conditions included Fibromyalgia, migraines, and pituitary adenoma with symptoms of pain, headaches, and dizziness and that her medications included oxycodone, Fioricet, and Zofran as needed for pain, migraines, and nausea.

24.    On January 26, 2021, Hartford sent Dr. Kahan a letter with several questions and asked him to "respond by 02/02/2021 in order to avoid any delays in processing your patient's claim for benefits."

25.    Despite only having a week to respond to Hartford's letter, Dr. Kahan responded that Franklin was "precluded from performing light level work on a full time basis" due to "Fibromyalgia pain and intermittent vision loss, [and] migraines." Answering Hartford's question about what "objective/medical findings have assisted you to arrive to [sic] your conclusion," Dr. Kahan noted "Fibromyalgia has very few if any objective findings under [sic] than hypersensitivity of pain receptors, which she does have." Finally, he noted that her prognosis was "Poor – Fair."

26.    On January 28, 2021, Hartford had another in-house nurse review Franklin's claim. Despite Dr. Brock's previous findings and Hartford's paying Franklin's claim for two years, and despite the nurse's (presumably) knowing there is no "objective" evidence of Fibromyalgia, Hartford's in-house nurse claimed Franklin's "R/Ls [restrictions and limitations] appears [sic] severe based upon the objective findings." The Hartford nurse therefore recommended referring Franklin's claim for a review by an "Occ Med" doctor. *C.f. Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 678 (9th Cir. 2011) ('conditioning an award on the existence of evidence that cannot exist is arbitrary and capricious.").

27.    Hartford, in turn, sent Franklin's claim to a vendor called "MLS" to obtain file reviews of Franklin's claim.

28.     Hartford and MLS have a long, profitable, and decidedly anti-claimant relationship. In *Hertz v. Hartford Life and Accident Ins. Co.*, 991 F.Supp. 2d 1121, 1136 (D. Nev. 2014), the Court reviewed multiple reports MLS had provded to Hartford and found they demonstrated "a significant bias towards finding a claimant capable of performing some type of work" and that, therefore, neither the reports nor the decisions based upon them were credible. *Id*.

29.     As the *Hertz* court explained: "the nature of Hartford's relationship with MLS and their reviewing physicians creates an incentive for MLS to reach results that are favorable to Hartford in order to foster and sustain their business relationship. Significantly, between January 2010 and November 6, 2012, MLS conducted 752 medical reviews for Hartford. In a sampling of 75 of those medical reviews, only four (4) were determined to be completely unable to work. Accordingly, MLS found that approximately 95% of all claimants could perform some type of work. During that same time frame, Dr. Rim reviewed fourteen (14) claims for Hartford. Significantly, of those fourteen (14) claims reviewed, Dr. Rim did not find that a single claimant was completely unable to perform any type of work. Accordingly, Dr. Rim found that 100% of all claimants could perform some type of work. The Court finds these statistics strongly suggest that both MLS and Dr. Rim harbored a significant bias towards finding a claimant capable of performing some type of work. *See Montour*, 588 F.3d at 634 (noting relevance of statistics regarding Hartford's rate of claims denials or how frequently it contracts with the file reviewers it employed in that case to the issue of bias)).

30.     Having apparently learned nothing from *Hertz* (or perhaps having learned exactly what it wanted to know), Hartford sent Franklin's claim to the same company it used in *Hertz*—MLS—to provide an allegedly "independent" reviews of Franklin's claim.

31.     MLS in turn sent Franklin's claim to Dr. Lucien Parillo, a sports-medicine doctor who is believed to have the same or similar anti-claimant biases

1     as Dr. Rim exhibited in the *Hertz* case. *Id.*; *see also Bertucci v. Aetna Life Ins. Co.*,

2     No. CV 19-10655, 2020 WL 4915723, at *11 (E.D. La. Aug. 21, 2020) ("In sum, the

3     Court is concerned that Dr. Parillo's opinion conflicts with the records he

4     reviewed, which consistently revealed substantial limitations with respect to the

5     amount of time Bertucci could remain seated."); *see also*

6     https://www.gesslerclinic.com/providers/lucien-parrillo/ (describing Dr.

7     Parillo as an "Addiction Medicine, Interventional Spine, Sports Medicine" doctor

8     (last visited March 21, 2022)).

9         32.     Dutifully doing his job, and in contrast to Dr. Brock's previous

10     detailed and specific findings, and in contrast to Hartford's paying Franklin's

11     claim for more than two years, Dr. Parillo claimed: "While it is evident this

12     claimant has been diagnosed/ treated for several chronic medical conditions

13     such as: Fibromyalgia, hepatic adenoma, migraine, and hyperprolactinemia, the

14     physically debilitating effects of these diagnoses has not been objectively

15     established." Dr. Parillo therefore claimed that aside from "two weeks following

16     each of her hepatic embolization procedures to allow for healing recovery

17     (12/8/2016 – 12/22/2016, and from 3/16/2017 – 3/30/2017)… the claimant does

18     not have any degree of physical impairment that is supported by the available

19     medical evidence."

20         33.     In support for his *not-disabled* opinion, Dr. Parillo noted that

21     "Clinical examinations with several providers has not documented any focal

22     neurological deficits that would impede physical activity." But Franklin is not

23     claiming disability due to stroke or an intracranial lesion. Therefore, a lack of

24     "focal neurological deficits" is an irrelevant red herring. *C.f.*

25     https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8118959/

26         34.     Consistent with Dr. Parillo citing immaterial medical evidence to

27     support his *not-disabled* theory, he further noted that "diagnostic testing has not

28     demonstrated any degree of neural impingement or other pathology that would

interfere with physical functioning." But again, Franklin is not claiming disability due to "neural impingement." Dr. Parillo's notations are not evidence that Franklin can work but are instead evidence of his biased, outcome-focused claims handling tendencies.

35.     Reaching even further to justify his unsupported *not-disabled* opinion, Dr. Parillo then noted that "Medical document reflects the claimant's ability to attend all scheduled physician appointments without difficulty as well as returning to part-time work." But attending doctors' appointments is not evidence of the ability to work full-time. Indeed, Franklin suspects discovery will show that if insureds miss doctors' appointments, Dr. Parillo would claim that is evidence that they do not have functional deficits (*i.e.* "if they were truly disabled, they would attend all doctors' appointments," or something to that effect).

36.     Moreover, Franklin's returning to "part-time work" is not evidence that she can work full-time. Instead, it is evidence that she is working to (and often beyond) her physical capacity due to her personal drive and solid work ethic, which are additional factors establishing Franklin's disability but which Dr. Parillo ignored and discounted.

37.     Finally, Dr. Parillo noted in his report: "More so, during the time period under review, the claimant has sustained the physical aptitude to successfully conceive, carry, and deliver two full-term pregnancies, despite her chronic medical conditions."

38.     Putting aside how offensive, shocking, and irrational this statement is, and as shown by the medical records Dr. Parillo claimed to have reviewed, Franklin had actually been put on bed rest for months during her pregnancies, had had to use a wheelchair and four wheel walker with brakes and a seat, and had had both babies delivered early by cesarean section — at 37 and 39 weeks —

9

due to her unstable medical conditions. Dr. Parillo, of course, ignored all these facts and strategically omitted them from his biased, misogynistic review.

39.    Based exclusively on Dr. Parillo's review, and without resolving any of the obvious inconsistencies contained within his review or the conflicts between his theories and what Dr. Brock had concluded not long before, Hartford promptly terminated Franklin's disability benefits.

40.    On February 22, 2021, Franklin timely appealed. With her appeal, she submitted:

        a.  A letter in which she detailed her medical conditions including pituitary adenoma, MEN1 syndrome, "severe migraine headaches," vision loss, occasional loss of consciousness, and fibromyalgia "which has only worsened with my second pregnancy and delivery." Franklin further noted that she "currently spend[s] all day in bed when I am not at work."

        b.  A note from Dr. Kahan in which he stated "Sabrina has fibromyalgia, which in general has no objective findings. This causes severe unpredictable pain, fatigue, and can affect cognition as well. She has frequent flare-ups which are unpredictable."

41.    On appeal, and rather than asking Dr. Brock to review Franklin's claim to see if her restrictions and limitations remained supported, and rather than looking critically at Dr. Parillo's review to see if it was medically supported, Hartford sent her claim to another MLS-like company called "ECN" to obtain three allegedly "independent" file reviews.

42.    ECN, in turn, hired three physicians to perform paper-only file reviews of Franklin's claim: a neurologist, Dr. David Hoenig; a rheumatologist, Dr. Rajendra Marwah; and an endocrinologist, Dr. Vijay Shivaswama.

43.     Upon information and belief, discovery will show that all three of these doctors exhibit the same anti-claimant biases as Dr. Rim was found to have exhibited in *Hertz v. Hartford* case, *supra*.

44.     As discussed in the following section, Dr. Hoenig's demonstrable biases include his likely never finding a claimant disabled due to migraine or other headaches and instead, parroting the same, biased, medically-unsupported rationale for rejecting their claims.

45.     Specifically, in his review of Franklin's claim, Dr. Hoenig stated: "It is acknowledged that the claimant has headaches… It would be reasonable that if the claimant has a headache that requires acute care than [sic] she would not be able to work that particular day, otherwise there are no specific restrictions and limitations pertaining to headaches." *But see infra*, Section titled "Dr. Hoenig's Demonstrable Biases" showing he gave the same, nearly-verbatim opinion in eight separate reports regarding headache claims, including in the concurrently-filed case *Sharon Baker v. Texas Instruments Long-Term Disability Plan*); *see also* Exhibits 1(a)-(h) hereto (eight redacted, allegedly "independent" Dr. Hoenig reports containing the same verbatim or near-verbatim language he used to justify denying Franklin's claim, including his report on Franklin's claim (Exs. 1(a), 1(h)) and his report in the concurrently-filed *Baker* case (Ex. 1(f)).

46.     In his review, Dr. Marwah stated "The standard of care is to keep claimants with FMS [Fibromyalgia Syndrome] as active as possible. It has clearly been shown that keeping FMS patients at rest and at home is counterproductive and counterintuitive." Dr. Marwah ignored, however, that Franklin had done exactly that by remaining at work part-time. Dr. Marwah further claimed (again wrongly) that "this claimant has not been offered any U.S. Food and Drug Administration (FDA) approved drug therapies (e.g. Lyrica, Savella)" and that "she has not been offered any standard non-drug therapies eg, aquatic therapy, CBT, yoga or meditation." To the contrary, Franklin's medical records (which

Marwah claimed to have reviewed) documented that "She has tried gabapentin, Lyrica, Cymbalta in the past with either side effects or not much relief"; that Dr. Kahan had held a "Lengthy discussion with patient and her husband regarding relaxation techniques, meditation, yoga, etc. She needs to be doing these things on a daily basis to help her. Stretching and heat daily also as directed"; and that Franklin "was referred to a pain psychologist to address her fibromyalgia. She is seeing Dr. Falcon…" Unsurprisingly given Marwah's obvious biases and predilection for selectively reviewing medical records and ignoring what does not fit his outcome-focused narrative, he opined that "The bottom line is that she should be able to work full time without any R/Ls from 2/17/21 to the present."

47.    The final reviewer, endocrinologist Dr. Shivaswamy, spoke with Dr. Kahan who agreed that Franklin's pituitary adenoma was not, on its own, disabling.

48.    In April 2021, and after being provided with Hoenig's, Marwah's, and Shivaswamy's file reviews, Franklin responded that "there was missing and incorrect information in the rheumatologist (Marwah) review," specifically that Marwah "states that I have not tried Lyrica (which I have) and have not done many other treatments for my fibromyalgia including yoga, CBT, mediation [sic] and aquatic therapy (all of which I have done and continue to do)." As she further explained, "I felt that his review of my primary issue was unfair and inadequate."

49.    In April 2021, Hartford also received records from Franklin's March 30, 2021 visit with her neurologist, Kyle Estep, NP, in which he documented, among other things, that Franklin "has a migraine about once weekly; will have headaches throughout the week"; and that she "reports history of syncopal episodes; last episode 3 days ago… reports 1-2 episodes per week." Estep's note then contained an incorrect notation in which he said (contrary to that very same note) that Franklin had "Frequent headaches, 1 migraine per month."

12

50.    Hartford thereafter requested addenda from Hoenig, Marwah, and Shivaswamy.

51.    In his addendum, Marwah selectively claimed based on Estep's obviously incorrect and internally inconsistent note that Franklin "now has one migraine episode every 4 weeks." Then, without addressing his previous, incorrect assertions that Franklin had not been offered Lyrica or other standard FMS medications, and without addressing the fact that she continued to engage in non-medical FMS management activities like yoga and meditation, Marwah gave his likely preordained opinion that "This claimant should be able to work full time and no R/Ls are warranted."

52.    In his addendum, even the ever-reliable Hoenig correctly noted that Franklin's "[m]igraines are once a week" and that "[s]he will have headaches throughout the week." But, of course, Hoenig also gave his preordained opinion that "[i]t is still acknowledged the claimant has headaches" and "[i]t would still be reasonable that if the claimant has a headache that requires acute care that she would not be able to work that particular day. Otherwise, there are no specific physical restrictions and/or limitations."

53.    In a July 22, 2021 note, Hartford adjuster Allison Porter included the text of an email Hartford had received from ECN which stated, "Good afternoon Allison, I wanted to take this opportunity to inform you that we are in receipt of the addendum panel report on Sabrina Franklin. However, we did have to return it to the provider for correcting. We will get this to you as soon as possible." In violation of ERISA, however, Hartford failed to include the pre-"corrected" reports in Franklin's claim file and failed to include any of ECN's documentation or correspondence relating to its request "for correcting" her report. *C.f.* 29 C.F.R. § 2560.503-1(m)(8).

54.    Based on Dr. Hoenig's, Dr. Marwah's, and Dr. Shivaswamy's reports, and without resolving any of the numerous and obvious falsities and

inconsistencies or errors in Dr. Hoenig's or Dr. Marwah's reports, without addressing the obvious inconsistencies between their theories and Dr. Brock's previous findings, Hartford denied Franklin's appeal.

### DR. HOENIG'S DEMONSTRABLE BIASES

55.    Upon information and belief, Dr. Hoenig has rarely, if ever, opined that a disability claimant was unable to work due to chronic headaches.

56.    In eight, allegedly "independent" file reviews Dr. Hoenig performed and which Franklin's counsel has been able to obtain, Hoenig gave identical rationale for asserting that an employee claiming disability due to chronic, debilitating headaches, was not actually disabled:

Exhibit 1(a):[1]

diagnostic studies for review. It would be reasonable that if the claimant has a headache that requires acute care than she would not be able to work that particular day, otherwise there are no specific restrictions and limitations pertaining to migraine headaches. It is acknowledged that the claimant has

Exhibit 1(b):

into restrictions and limitations. There is no documentation of any neurological deficits on exam.  It is acknowledged that the claimant has chronic headaches. It would be reasonable that if the claimant has a headache that requires acute care that she would not be able to work that particular day. Otherwise, there are no clear physical restrictions or limitations.

Exhibit 1(c):

documentation of any significantly abnormal neurological diagnostic studies.  It would be reasonable that if the claimant has a headache that requires acute care that she would not be able to work that particular day.  Otherwise, there are no specific restrictions or limitations.

---

[1] All highlighting and redactions to Exhibits 1(a)-(h) are added.

Exhibit 1(d):

Regarding headaches, it would be reasonable that if the claimant has a headache that requires acute care that he would not be able to work that particular day, but there were no specific physical restrictions or limitations related to headaches.

Exhibit 1(e):

any significantly abnormal new pathology on any diagnostic studies. It would be reasonable that if the claimant had a headache that requires acute care that he would no be able to work that particular day, but there are no specific physical restrictions or limitations related to the headaches.

Exhibit 1(f):

diagnostic studies. It is reported that the claimant had normal MRIs. It would be reasonable that if the claimant has a headache that requires acute care that she would not be able to work that particular day. Otherwise, there are no specific physical restrictions and limitations. There was documentation of musculoskeletal pathology.

Exhibit 1(g):

negative. It would be reasonable that if the claimant has a headache that requires acute care that she would not be able to work that particular day. Otherwise, there are no specific physical restrictions and limitations pertaining to migraines. There is documentation of mental health

Exhibit 1(h):

detailed history and physical examination by Pain Management submitted for review. It would still be reasonable that if the claimant has a headache that requires acute care that she would not be able to work that particular day. Otherwise, there are no specific physical restrictions and/or limitations.

57.    A disability reviewer like Dr. Hoenig who opines 100% of the time that claimants are not disabled, or that they are capable of full-time work, is not independent, unbiased, or credible. *See Hertz*, 991 F. Supp. 2d at 1136 ("Dr. Rim did not find that a single claimant was completely unable to perform any type of work. Accordingly, Dr. Rim found that 100% of all claimants could perform some

type of work. The Court finds these statistics strongly suggest that both MLS and Dr. Rim harbored a significant bias towards finding a claimant capable of performing some type of work." (record citations omitted)).

58.     Upon information and belief, discovery will show that Dr. Hoenig gives "not disabled" opinions in 100% or near-100% of cases in which he performs an allegedly "independent" file review. *See Hertz*, *supra*.

### HARTFORD, THE COMPANIES IT HIRED TO PROVIDE "INDEPENDENT" FILE REVIEWS (MLS AND ECN), AND DRS. PARILLO AND MARWAH ARE LIKELY JUST AS BIASED AS DR. HOENIG

59.     In this case, Hartford obtained Parillo's review, which it relied upon to terminate Franklin's ongoing disability benefits, from the same company it used in the *Hertz*, 991 F.Supp.2d at 1136, "MLS."

60.     Hartford then obtained the allegedly "independent" appeal reviews of Franklin's case through another, similar company, ECN.

61.     Upon information and belief, and since the *Hertz* case was decided, discovery will show MLS has not changed its practices in any way to ensure disability claimants are provided the full and fair review to which they are entitled under ERISA. *C.f. Id.* ("MLS found that approximately 95% of all claimants could perform some type of work… The Court finds these statistics strongly suggest that… MLS… harbored a significant bias towards finding a claimant capable of performing some type of work.").

62.     Upon information and belief, discovery will show that like MLS, ECN also harbors "a significant bias towards finding a claimant capable of performing some type of work." *See Id.*

63.     Upon information and belief, discovery will further show that MLS, ECN, and Hartford have taken no steps to ensure the "neutrality in practice" of their reviewing physicians like Dr. Parillo, Dr. Hoenig, and Dr. Marwah. *C.f.*

*Demer*, 835 F.3d at 903 ("Here, MetLife could have maintained records of its reviewers' findings on claims to show their neutrality in practice, but it did not." (footnote omitted)).

64.     Upon information and belief, Hartford, MLS, and ECN have also failed to maintain information to show their reviewing physicians "do not in fact have a parsimonious pattern of assessment unfavorable to claimants." *Id.* at n. 8.

65.     Upon information and belief, Hartford, MLS, and ECN deliberately failed and continue to fail to "maintain[] records of its reviewers' findings on claims" because doing show would show their lack of "neutrality in practice" and would confirm that their reviewers' opinions are biased, outcome-focused, and antithetical to ERISA's obligations to provide claimants with a "full and fair review" of their claims. *Id.*; *c.f.* 29 C.F.R. § 2560.503-1(h).

66.     Upon information and belief, Hartford, MLS, and ECN deliberately failed and continue to fail to "maintain[] records of its reviewers' findings on claims" in order to protect the profitability of their biased claims handling and to minimize (or eliminate) liability for disability benefits.

67.     Upon information and belief, Hartford, MLS, and ECN deliberately failed and continue to fail to "maintain[] records of its reviewers' findings on claims" in order to deprive claimants of the ability to easily prove that their reviewing physicians harbor deep anti-claimant biases. *See e.g. Hertz*, *supra* (reviewing doctor's finding in 100% of claims that the claimants could work was evidence of "a significant bias"); *Demer*, *supra* (criticizing insurer that could have maintained statistics to show reviewers' "neutrality in practice" when it failed to do so).

68.     Upon information and belief, Hartford's, MLS's, and ECN's failure to "maintain[] records of its reviewers' findings on claims to show its neutrality in practice" was and is driven by their financial conflicts of interest which, at all

1    times, infected the claim process and deprived Franklin of the full and fair
2    review to which she is entitled under ERISA. *See Demer*, *Hertz*, *supra.*

3         69.    Upon information and belief, Dr. Parillo's, Dr. Hoenig's, and Dr.
4    Marwah's likely giving "not disabled" opinions in 100% or near 100% of
5    reviewed cases is due to their financial conflicts of interest in, among other
6    things, protecting their extremely lucrative roles as allegedly "independent"
7    reviewers of disability claims. *Accord Demer*, 835 F.3d at 904 ("we simply apply
8    the unremarkable proposition that the number of examinations referred and the
9    size of the professional fees paid to a reviewer may compromise the neutrality of
10   an expert."); *accord Id.* at 902 ("The magnitudes of these numbers [amounts paid
11   to reviewing physicians], particularly when combined, raise a fair inference that
12   there is a financial conflict which influenced the IPCs' assessments, and thus
13   such conflict should be considered as a factor in reviewing MetLife's decision for
14   abuse of discretion.").

15        70.    In violation of their fiduciary obligations under ERISA, Hartford,
16   MLS, and ECN ignored obvious inconsistencies in Dr. Parillo's, Dr. Hoenig's,
17   and Dr. Marwah's reports in order to improperly deny Franklin's LTD claim.

18        71.    In further violation of its fiduciary obligations under ERISA,
19   Hartford deliberately failed to reconcile, or even try to reconcile, Dr. Parillo's, Dr.
20   Hoenig's, and Dr. Marwah's inconsistent and incorrect theories with the
21   extensive evidence in the file contradicting their *not-disabled* theories; including
22   but not limited to Dr. Brock's prior review in which he found "Physical activity is
23   a known aggravator of migraine headaches," that "when migraine headache is
24   occurring, the insured would not be able to function in a vocational
25   environment," that Franklin's "headaches are aggravated by physical activities
26   and typically the insured would be taking analgesics and be in a quiet, dark
27   room when such headaches occurred," that Franklin was therefore precluded
28   from working full-time.

72.    At all times material hereto, Hartford's, MLS's, and ECN's claims-handling conduct and decisions were caused, contributed to, and infected by their and their allegedly "independent" reviewing physicians' financial and other conflicts of interest which deprived Franklin of the full and fair review to which she is entitled under ERISA. *See Demer*, *Hertz*, *supra*.

## COUNT ONE: CLAIM FOR BENEFITS UNDER ERISA, 29 U.S.C. § 1132(A)(1)

73.    Franklin incorporates all preceding allegations as though set forth herein.

74.    Franklin is "Disabled and Working" as defined by the LTD plan.

75.    Franklin is entitled to ongoing LTD benefits under the plan.

76.    Hartford's and its allegedly "independent" reviewers opinions and decisions were at all times caused, driven, and infected by their inherent financial and other conflicts of interest which deprived Franklin of the full and fair review to which she is entitled under ERISA.

77.    Upon information and belief, discovery will show that Drs. Parillo, Hoenig, and Marwah have a 100% or near-100% rate of rendering "not disabled" opinions in order to aid and abet disability plan administrators, disability claim administrators, third-party medical review companies, and disability insurers in their efforts to wrongfully deny valid disability claims.

78.    Franklin has been harmed by Hartford's wrongful decision terminating her LTD claim.

79.    Under the "abuse of discretion" standard of review, Hartford's decisions denying Franklin's LTD claim were arbitrary, capricious, unreasonable, not supported by the evidence, and were caused and contributed to by their financial and other conflicts of interest as discussed above.

80.    Under the *de novo* standard of review, Hartford's decisions denying Franklin's LTD claim were contrary to the evidence and *de novo* wrong.

81. Regardless of the standard of review, Franklin is entitled to ongoing LTD benefits under the plan.

WHEREFORE plaintiff Sabrina Franklin prays for relief as follows:

A. For long-term disability benefits due under her employer's LTD plan;

B. For any other benefits Franklin may be entitled to receive under her employer's ERISA-governed benefits plan due to her disability;

C. For pre- and post-judgment interest at the maximum allowable legal or equitable rate (29 U.S.C. § 1132(a)(3)), but in no event at a rate lower than the maximum rate at which Hartford profited, earned return on interest, earned return on equity, or otherwise benefitted from the wrongful denial and withholding of Franklin's LTD benefits;

D. For attorney's fees and costs incurred as a result of prosecuting this suit pursuant to 29 U.S.C. § 1132(g); and

E. For any other relief the Court deems just, proper, or equitable.

DATED this 7th day of April, 2022.

LAW OFFICE OF PATRICK MAUSE, PLLC

By: _s/ Patrick W. Mause_
        Patrick W. Mause
        Attorney for Plaintiff