Patrick W. Mause (SBN 024269)
Law Office of Patrick Mause, PLLC
1830 East Broadway, Suite 124-302
Tucson, AZ 85719
(520) 342-0000
(520) 342-0001 (fax)
Patrick@PMauseLaw.com

*Attorney for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sabrina Franklin,<br><br>                                  Plaintiff,<br><br>v.<br><br>Hartford Life and Accident Insurance Company;<br><br>                                  Defendant. | Case No. CV-22-168-TUC-JAS<br><br>**PLAINTIFF'S LRCIV. 37.1 STATEMENT IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL** |

Pursuant to LRCiv. 37.1, plaintiff Sabrina Franklin submits her separate statement supporting her concurrently-filed *Motion to Compel*.

## <u>Requests at Issue</u>

There are four requests are issue in Franklin's *Motion to Compel*:

1. Request for prior reports of physicians who reviewed Franklin's claim and provided opinions for Hartford:

    a.  Dr. Lucien Parillo

    b.  Dr. Rajendra Marwah

    c.  Dr. David Hoenig

2. Request for prior reports of the Hartford vendors who obtained those physician reviews for Hartford:

    a.  MLS (or the MLS Group of Companies)

    b.  ECN (or Exam Coordinators Network)

3.  Request for "all claim metrics or claim tracking documents or tools that include or incorporate data or information relating to Plaintiff's claim."

4.  Request for depositions of the Hartford adjusters who denied Franklin's claim and her appeal:

    a.  Alli Porter

    b.  Jackson Pitzer

While each request is discussed more specifically below, Franklin notes that as to prior reports of Hartford's vendors and reviewers, Franklin limits her request to a maximum of 100 such reports. Thus, whereas some reviewers and vendors provided Hartford with ████ ████ of reports, her request is not so expansive. Instead, her request is in line with the court's holding in *Hertz*, in which the court required Hartford to produce 10% of the prior vendor reports (total of 75) and all 100% of the prior reviewer reports (total of 14). *Hertz v. Hartford Life and Accident Ins. Co.*, 991 F.Supp.2d 1121, 1136 (D. Nev. 2014); *Hertz* Doc. 36 (included in binder containing highlighted case law).

Note: Because RFPs 2 and 3 involve the same types of requests—prior reports of vendors and reviewing physicians—because Hartford's objections all fail for the same basic reasons, to avoid unnecessary and duplicative copying-and-pasting, and therefore to conserve the parties' and the Court's time reviewing the issues and briefing, Franklin is combining her discussion of RFPs 2 and 3.

## I.    Request for Production Nos. 2 and 3: (2) Prior Reports of Parillo, Marwah, Hoenig; (3) Prior Reports of ECN and MLS.

### 1. Question Propounded.

Request for Production No. 2:

For the period January 1, 2020 through December 31, 2021, produce any and all reports of disability file reviews You have received (either directly or through any external review company or other source) from any of the following reviewers:

- Lucien Parillo, M.D.

- Rajendra Marwah, M.D.
- David Hoenig, M.D.

*See* Ex. 33 at 2-3.[1]

Request for Production No. 3:

For the period January 1, 2020 through December 31, 2021, produce any and all reports of disability file reviews You have received from any of the following Third Party Review Companies:

- MLS or the MLS Group of Companies
- ECN or Exam Coordinators Network

**2. Hartford's Responses.**

Hartford Response to Request for Production No. 2:

Hartford objects to this Request for Production as the question seeks private, confidential, and highly protected medical reports of individuals who are not a party to this lawsuit, nor are their claims at issue in this lawsuit. Hartford further objects on the grounds that the disclosure sought would constitute a direct violation of HIPAA and other federal privacy laws that protect sensitive and confidential medical information. Hartford further objects to the extent this Request for Production seeks information which is beyond the reasonable scope of discovery in this ERISA case by seeking any and all reports of disability file reviews generated by Dr. Lucien Parillo, Dr. Rajendra Marwah and Dr. David Hoenig, none of which are employed by Hartford and spanning a two year period of time. Hartford further objects to this request as it is overly broad in scope, unduly burdensome and oppressive. The reports sought have no relevance to the whether Hartford abused its discretion in determining that Plaintiff had not met her burden of proving disability and entitlement to benefits beyond February

---

[1] For ease of reference, Franklin is numbering the exhibits continuously beginning with the exhibits in her *Motion to Compel* and continuing with the exhibits reference herein.

18, 2021, which is the subject of this lawsuit and this request is not proportional to the needs of this case.

*See* Ex. 33 at 3.

<u>Hartford Response to Request for Production No. 3</u>:

Hartford objects to this Request for Production as the question seeks private, confidential, and highly protected medical reports of individuals who are not a party to this lawsuit, nor are their claims at issue in this lawsuit. Hartford further objects on the grounds that the disclosure sought would constitute a direct violation of HIPAA and other federal privacy laws that protect sensitive and confidential medical information. Hartford further objects to the extent this Request for Production seeks information which is beyond the reasonable scope of discovery in this ERISA case by seeking any and all reports of disability file reviews generated by MLS Group of Companies ("MLS") or Exam Coordinators Network ("ECN") over a two year period of time. Both MLS and ECN operate as independent third party companies that engage with independent doctors to perform a medical peer review. Hartford further objects as this request is overly broad in scope, unduly burdensome, and oppressive. The requested reports pertain to the individualized claims of other claimants which have no relevance to the long term disability claim brought by Plaintiff. The request bears no relevance to whether Hartford abused its discretion in determining that Plaintiff had not met her burden of proving disability and entitlement to benefits beyond February 18, 2021, which is the subject of this lawsuit and thus this request is not proportional to the needs of this case.

**3. Reasons Responses Are Deficient.**

Hartford's stated reasons for objecting to producing the reports requested in RFP 2 (reviewers) and RFP 3 (vendors) fall into five basic categories; none of which is a legitimate objection.

1            *1) Privacy and HIPAA*

2        Hartford's privacy and HIPAA objection should be overruled. First, Hartford was able

3   to produce prior reports of MLS and the reviewing physician and *Hertz* without issue;

4   presumably by redacting information such as the claimants' names, dates of birth, and other

5   identifying information. *Hertz v. Hartford Life and Accident Ins. Co.*, 991 F.Supp.2d 1121, 1136

6   (D. Nev. 2014). Indeed, as that court explained in finding Hartford abused its discretion

7   because the evidence showed its biases infected the entire claims process,

8        MLS conducted 752 medical reviews for Hartford. In a sampling of 75 of those
     medical reviews, only four (4) were determined to be completely unable to
9        work. Accordingly, MLS found that approximately 95% of all claimants could
     perform some type of work. During that same time, Dr. Rim reviewed
10       fourteen (14) claims for Hartford. Significantly, of those fourteen (14) claims,
     Dr. Rim did not find that a single claimant was completely unable to work.
11

12  *Id.* (record citations omitted). Consequently, Hartford had disclosed and the court reviewed

13  89 reports without incurring any insurmountable privacy issues. *Id.*; *see also Hertz* Doc. 36

14  (ordering Hartford to "produce 10% of those 752 [MLS] files, or seventy-five (75) files."). In

15  the *Hangarter* case, the Ninth Circuit noted that the evidence supporting punitive damages

16  included the fact that the "evidence showed that in thirteen out of thirteen cases involving

17  claims for total disability, Dr. Swartz rejected the insured's claim that he or she was totally

18  disabled." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1011 (9th Cir. 2004). Again,

19  the production of prior reports appears to have occurred without issue.

20       In *Kravetz*, Judge Martone held that the plaintiff's request for prior reports of the IME

21  doctor "seems plainly calculated to lead to the discovery of admissible evidence on plaintiff's

22  theory of bias." *Kravetz v. Paul Revere Life Ins. Co.*, No. CV-08-1060-PHX-FJM, 2009 WL

23  77649, at *1 (D. Ariz. Jan. 12, 2009). He further held that the "privacy and HIPAA objection

24  can be dealt with by having plaintiff's counsel review the documents, copy only those that are

25  desired, and protect them from disclosure under Rule 26(c)(1)(G)." *Id.*

26       The same is true here: To the extent Hartford believes prior reports may contain

27  protectible information it may redact that information before producing it. Or if Hartford

28  believes redacting would be burdensome, Franklin's counsel is willing to accept the un-

redacted documents and make the appropriate redactions of personally-identifying information before redisclosing them to Hartford. Then, if Hartford believes the post-redaction prior reports qualify for confidentiality, those concerns may be addressed under the Court's Protective Order, Doc. 39. Because Hartford or Franklin can redact any personally identifying information and utilize the Court's protective order, there is no merit to Hartford's privacy and HIPAA arguments. *Kravetz*, *supra*.

Franklin's counsel has also been involved in two cases in which the defendant insurance companies produced prior reports of reviewing physicians, *Knuth* and *Jalowsky*. In *Knuth*, the court overruled the insurer's objections to producing the prior reports; including the same types of "privacy" and "HIPAA" arguments Hartford asserts here. *See* Ex. 34 at 2-4; Ex. 35 at 1. Judge Ferraro disagreed, however, and ordered the prior reports produced. *See* Ex. 35.[2]

In *Jalowsky*, Judge Bowman likewise overruled the defendant insurer's objections to producing prior reports. *See* Ex. 37 at 7-8, 9. Among the objections the defendant insurer had raised there was that "the request seeks documents that contain personal, private information regarding other insureds, who have a right to privacy." *See* Ex. 36 at 17-18. In light of the insurer's argument that redacting nearly 5 years of prior reports would be burdensome—which involved roughly 1,000 reports per year—Judge Bowman agreed that "combing through [the] 4,658 [responsive] files to redact personal identifiers would be burdensome." *See* Ex. 37 at 8. She therefore limited the request "to the records generated in the year before he submitted his claim, August 3, 2015 to August 3, 2016." *Id*.[3] As in *Hertz*, *Hangarter*, *Kravetz*, and *Knuth*, the defendant insurer in *Jalowsky* was then able to produce the prior reports with redactions that were adequate to address any alleged privacy concerns.

---

[2] In her RFP "Procedures," Franklin instructed Hartford to redact the "personal identifying information… preserving the individual's privacy" before production.

[3] Judge Bowman later limited the production to prior reports from the two primary physicians the insurer had relied upon due to additional, case-specific reasons.

Finally, as a group disability insurer, Hartford is not subject to HIPAA. [4] Indeed, an older version of Hartford's claim file notes that "Group Disability is not a 'covered entity' under HIPAA, meaning we are not re[quired to] comply with HIPAA's rules." *See* Ex. 38.[5]

Hartford's HIPAA and privacy objections are ill-founded and should be overruled.

       *2) Beyond the Scope of Reasonable Discovery*

Hartford's objection that Franklin's request is "beyond the reasonable scope of discovery in this ERISA case" should also be overruled. As noted above, and because of the huge number of reviews Hartford received from two of the reviewing physicians (Hoenig, Parillo) and the vendors (ECN, MLS), she is limiting her request to a maximum of 100 prior reports from each.

Additionally, as *Hertz*, *Demer*, and *Montour* show, prior reports are crucial conflict and bias evidence. Indeed, after noting that Demer had "satisfied his burden" of showing a conflict because the reviewing physicians "have earned a substantial amount of money from MetLife ($125,000-$175,000 each year) and have performed a substantial number of reviews for the company as well (200-300 reviews/addendums each year)," the *Demer* court criticized the plaintiff for not providing "more powerful evidence" of the reviewers' biases such as "statistics showing a pattern of assessments disfavorable to claimants." *Demer*, 835 F.3d at 902-03 (citing *Montour*, 588 F.3d at 634). This is the evidence Franklin's requests seek. And, of course, the *Hertz* court found the prior report evidence to be powerfully incriminating, particularly the fact that the prior reports showed the reviewing physician was batting 1,000 in providing *not-disabled* opinions while MLS was batting 950; i.e. rendering 100% and 95% *not-disabled* opinions, respectively. *Hertz*, 991 F.Supp.2d at 1136. Since Hartford was a party to *Hertz* and is therefore fully aware of prior reports' significance, its argument that Franklin's similar request is "beyond the reasonable scope of discovery" is tough to swallow. The reality is Hartford likely knows what the discovery will show (despite *Hertz's* excoriation of MLS

---

[4] *See e.g.* https://www.hhs.gov/hipaa/for-professionals/covered-entities/index.html ; https://www.cms.gov/Regulations-and-Guidance/Administrative-Simplification/HIPAA-ACA/AreYouaCoveredEntity

[5] This previous version of Hartford's claim file was produced non-confidentially pursuant to a court's order compelling Hartford to produce its entire claim file not subject to a protective order. *Jacoby v. Hartford Life & Acc. Ins. Co.*, 254 F.R.D. 477, 479 (S.D.N.Y. 2009).

Hartford reused them here) and is trying to prevent Franklin and the Court from accessing and considering that powerfully incriminating evidence.

### 3) Overly Broad, Burdensome, and Oppressive.

When serving her RFP, Franklin did not anticipate that ECN, MLS, and the reviewing physicians would be so prolific. Specifically, she never anticipated that MLS would have provided Hartford with over ███ reports over a two year period, or that ECN would have provided over ███. *See* Ex. 33 at 11-12. After all, in *Hertz*, Hartford had only received 752 reports from MLS over a nearly three year period—January 2010 to November 6, 2012—or roughly 250 per year. *Hertz*, 991 F.Supp.2d at 1136; *see also* Ex. 44 at 6, Entry re Doc. 36. Additionally, post-*Hertz* one would have expected Hartford—if it were trying to review claims in a fair and unbiased manner—to rely on the company *less* and not ███ *more*. *Id.*

Likewise, Franklin did not expect Hartford's reviewing physicians to be so prolific, with Dr. Parillo providing ██ reports to Hartford over two years and Dr. Hoenig providing ██. *Id.* at 10-11.

While these numbers, on their own, are surprising, especially in light of Hartford's enormously increased reliance on its vendors and certain reviewers post-*Hertz*, and although Franklin believes a larger production of reports is warranted and appropriate in light of these startling numbers, as part of the meet-and-confer process she offered to accept a maximum of 100 prior reports from each reviewer and vendor. Thus, as to ECN and MLS, she essentially asked for ██% of the prior reports as opposed to the 10% Hartford was ordered to produce in *Hertz*. *Id.*; Ex. 44 at 6. With respect to Parillo and Hoenig, her request was for only ██% and ██% of their reports, respectively. *Id.*; Ex. 44 at 6.[6]

In light of Hartford's obligation to produce 10% of MLS's reports in *Hertz* and 100% of the reviewing physician's reports, Franklin's request for a much more modest percentage of reports here—██% of Hartford's MLS and ECN reports, and ██% and ██% of Parillo's and Hoenig's reports—is neither burdensome nor oppressive. This is especially true in light

---

[6] Since Dr. Marwah provided Hartford with ██ reports over two years, Franklin's request for a maximum of 100 prior reports per entity wou d involve all of his reports.

of the likely millions or billions of dollars Hartford has saved based on their reports. For example, the present value of Franklin's denied LTD benefits is around $1 million. If we make a few, conservative assumptions, the amounts Hartford has saved based on the biased reviews of ECN, MLS, Parillo, Hoenig, and Marwah is staggering. For example, if ECN, MLS, and the reviewing physicians all have a 90% rate of rendering *not-disabled* opinions—as opposed to the established 95% and 100% rates in *Hertz*—and if the average LTD claim Hartford denied based on their reviews is only 20% of the value of Franklin's claim, or $200,000, Hartford would have saved $█████ dollars in LTD liabilities over two years based on their reviews. Even if we go more conservative and assume the reviews performed by Parillo, Hoenig, and Marwah were all obtained by ECN and MLS, and we therefore omit their number of reviews they performed from the calculation to avoid potential duplication; and even if we assume the average amount of the LTD claims Hartford denied based on ECN's and MLS's reviews were only 10% of the value of Franklin's claim, or $100,000 per cleaim; and even if we assume ECN and MLS are slightly less biased than the evidence showed in *Hertz* and their reports say only 90% of claimants are *not-disabled* as opposed to MLS's 95% denial rate in *Hertz*, the numbers are still staggering: $█████ dollars in eliminated LTD liabilities over two years.

No matter how much Hartford claims it may cost to produce the requested prior reports, it is coming out way ahead; likely by a factor of 25,000 or more.

    *4) No Relevance.*

Hartford's argument that Franklin's discovery lacks relevance is unsupportable. *Demer* and *Montour* made clear that this type of evidence is not only relevant but that a plaintiff errs by failing to introduce it. *Demer*, 835 F.3d at 902-03 ("To be sure, the lack of more powerful evidence, *e.g.*… statistics showing a parsimonious pattern of assessments disfavorable to claimants, minimizes the 'weight assigned to the conflict of interest as a factor in the overall analysis of whether an abuse of discretion occurred.'" (quoting *Montour*, 588 F.3d at 634; internal citation, footnote, and brackets omitted)). Indeed, given that *Montour* was another Hartford case, and that that court likewise criticized the plaintiff for failing to obtain and

introduce this type of evidence, it is hard to fathom how Hartford can make a "no relevance" argument with a straight face. *Montour*, 588 F.3d at 634 ("On the other hand, Montour also did not submit any extrinsic evidence of bias, such as statistics regarding Hartford's rate of claims denials… in this case."). And, of course, when Hartford was ordered to produce this type of evidence in *Hertz*, it proved virtually dispositive:

> Likewise, the nature of Hartford's relationship with MLS and their reviewing physicians creates an incentive for MLS to reach results that are favorable to Hartford in order to foster and sustain their business relationship. Significantly, between January 2010 and November 6, 2012, MLS conducted 752 medical reviews for Hartford. In a sampling of 75 of those medical reviews, only four (4) were determined to be completely unable to work. **Accordingly, MLS found that approximately 95% of all claimants could perform some type of work**. During that same time frame, Dr. Rim reviewed fourteen (14) claims for Hartford. Significantly, of those fourteen (14) claims reviewed, Dr. Rim did not find that a single claimant was completely unable to perform any type of work. **Accordingly, Dr. Rim found that 100% of all claimants could perform some type of work. The Court finds these statistics strongly suggest that both MLS and Dr. Rim harbored a significant bias towards finding a claimant capable of performing some type of work.** *See Montour,* 588 F.3d at 634 (noting relevance of statistics regarding Hartford's rate of claims denials or how frequently it contracts with the file reviewers it employed in that case to the issue of bias).
>
> **In sum, Hartford's own structural conflict of interest, as well as its reliance on biased vendors, persuade the Court to review Hartford's decision to terminate Hertz's LTD benefits with significant skepticism. Moreover, it can be reasonably inferred from the following circumstances that Hartford's bias infiltrated the entire administrative decision-making process. Accordingly, the Court shall weigh Hartford's conflict of interest more heavily**. *See Glenn,* 554 U.S. at 117, 128 S.Ct. 2343 (considering a conflict of interest to be of great importance "where circumstances suggest a higher likelihood that it affected the benefits decision"); *see also Montour,* 588 F.3d at 634; *Kurth,* 845 F.Supp.2d at 1097.

*Hertz*, 991 F.Supp.2d at 1136 (record citations omitted, emphasis added).

Demer, *Montour*, and *Hertz* are not the only courts that have found evidence or statistics that may be elucidated through the production of prior reports to be relevant. Numerous

other courts throughout the Ninth Circuit have found this evidence to be relevant or subject to discovery, including:

- *Caplan v. CNA Financial Corp.* 544 F.Supp.2d 984, 990 (N.D. Cal 2008)
  - "Dr. Mahawar has performed chart reviews for UDC on a number of occasions, producing 217 evaluations for 202 <u>Hartford</u> claimants between January 1, 2005, and September 30, 2007. A summary of Dr. Mahawar's findings demonstrates that, of these 202 claimants, he found that 193 of them were capable of working full-time in some type of position under appropriate restrictions." (emphasis added)
  - "Hartford's structural conflict of interest is accompanied by its reliance on UDC, a company which <u>Hartford</u> knows benefits financially from doing repeat business with it, collecting more than thirteen million dollars from Hartford since 2002. It follows that Hartford knows that UDC has an incentive to provide it with reports that will increase the chances that Hartford will return to UDC in the future-in other words, reports upon which Hartford may rely in justifying its decision to deny benefits to a Plan participant... Because Hartford's reliance on these apparently biased sources casts serious doubt on the neutrality of its decision-making process, the Court will view the decision with commensurate skepticism." *Id.* at 992 (emphasis added).
- *Coffou v. Life Ins. Co. of N. Am.*, 2020 WL 1502104 at *2-3 (D. Ariz. 2020)[7]
  - "The outcome of this case turns on the credibility of the experts... where an expert or the third-party vendor who supplies that expert... overwhelming[ly] renders opinions in their favor, such evidence may be important in accessing that expert's bias and credibility... LINA will be required to [produce] the number of times its internal vocational and

---

[7] Hartford's counsel here was also defense counsel in *Coffou*.

medical reviewers utilized here… concluded that a claimant could perform work."

- *Eisner v. Prudential Ins. Co. of Am.*, 2013 WL 10903701 at *2 (N.D. Cal. 2013)
  - "This document request also seeks information about the percentage of claims reviewed by MES or other third-party reviewers that were denied or terminated in whole or in part. As plaintiff correctly points out, 'The claims fiduciary's track record in approving and denying disability claims ('a parsimonious claims-granting history') is a specifically relevant inquiry.'"
- *Fortlage v. Heller Ehrman LLP*, 2011 WL 1752652 (N.D. Cal 2011)
  - "Plaintiff's discovery requests shall be limited as follows… the number of claims handled by the doctor, the number of claims approved by the doctor… the temporal scope of discovery shall be limited to January 1, 2008 through August 10, 2010, which is the date that Unum completed the post-remand review."
- *Jones v. Life Ins. Co. of N. Am.*, 457 F.Supp.3d 751, 755-56 (D. Ariz. 2020)[8]
  - "where an expert or the third-party vendor who supplies that expert has a long-standing relationship with or receives substantial compensation from a carrier or industry, and overwhelmingly renders opinions in their favor, such evidence might be important in accessing that expert's bias and credibility… This warrants discovery into LINA's relationships with those vendors and the experts who rendered opinions upon which the determination to terminate Plaintiff's LWOP benefit was based… The Court will require LINA to… respond to requests for the production of documents that explore the history of its relationships, from 2016 through 2019, with the third-party vendors (Genex, ECN and MES Solutions) and

---

[8] Hartford's counsel here was also defense counsel in *Jones*.

the experts (Drs. Belcourt and Kalp), it employed here… [including] the number of times they concluded that a claimant could perform work."

- *Klein v. Northwestern Mut. Life Ins. Co.*, 806 F.Supp.2d 1120, 1128-29 (S.D. Cal. 2011)
    - "Additionally, the number of claims handled and the number of claims approved by the claims administrator are also proper subjects of discovery and, under certain circumstances, the approval rate by doctor may be appropriate. Similarly, a sampling of reports a doctor has prepared in other claims may also be appropriate… At a minimum, discovery is allowed into… statistical information as to the number of claims handled and denied. " (citations omitted).

- *Kroll v. Kaiser Found. Health Plan Long Term Disability Plan*, 2010 WL 1233871 at *1 (N.D. Cal. 2010)
    - "Plaintiff has asked for written discovery regarding three subject matters. The first is, in essence, a document request asking for a sampling of reports that Dr. Sloan has prepared for MetLife in other disability cases. The Court grants this request. MetLife shall produce twenty-five reports of Dr. Sloan closest in time to the report generated for Plaintiff."

- *Santos v. Quebecor World Long Term Disability Plan*, 254 F.R.D. 643, 649-50 (E.D. Cal. 2009)
    - "Insofar as Plaintiff seeks statistical information regarding the number of claimants seeking long term disability benefits with certain diagnoses, the approval rate of such claims, and claims granting history related to those with a familial, fiduciary or close relationship with <u>Hartford</u>, Plaintiff is entitled to information regarding the claims and claims granting history… Plaintiff is entitled to statistical information concerning the number of disability claims by each doctor evaluated on behalf of Hartford, including the number of times the doctors concluded that a claimant was or was not disabled." (emphasis added).

-13-

- *Walker v. Metro. Life Ins. Co.*, 585 F.Supp.2d 1167, 1175 (N.D. Cal. 2008)
  - "Key to determining whether MetLife's conflict of interest, compounded by its reliance on a company with an incentive to provide it biased reports, led to a 'parsimonious claims granting history' in the words of *Abatie* or a 'history of biased claims administration' in the words of *Glenn,* is statistical information regarding NMR physician reviews relied upon by MetLife in making its disability claim determinations. When Mr. Walker sought to obtain this information through discovery, however, MetLife contended that neither it nor NMR maintained such 'track record' information and that generating it would be too burdensome and expensive… Accordingly, MetLife is hereby ordered, **within thirty days,** to state under order the number of claims it has accepted or granted and rejected or denied after a review by a physician retained through NMR from 2005 through 2007."[9]
- *Wilcox v. Metro Life Ins. Co.*, 2009 WL 57053 at *3 (D. Ariz. 2009)
  - "Plaintiff may conduct discovery into the following areas… Defendant's general approval and termination rates for long-term disability claims, and, separately, for long-term disability claims involving fibromyalgia… Plaintiff may serve one set of document production requests, not to exceed 10 requests, including subparts… Plaintiff may take three depositions."

In short, Franklin's requested discovery, including prior reports by ECN, MLS, and Drs. Parillo, Marwah, and Hoenig, is relevant.

     *5) Not Proportional to the Needs of the Case.*

   Rule 26 lists six factors to consider when evaluating whether discovery is "proportional to the needs of the case." Fed R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the

---

[9] The *Walker* court further noted that if MetLife failed to produce the statistical evidence, "this Court will infer that MetLife has not granted a single claim in which NMR reviews were obtained" and that a "trial will then be required in order to fully vet MetLife's exercise of discretion and the role played by its conflict therein." *Id.*

-14-

needs of the case, considering [1] the importance of the issues at stake in the action, [2] the amount in controversy, [3] the parties' relative access to relevant information, [4] the parties' resources, [5] the importance of the discovery in resolving the issues, and [6] whether the burden or expense of the proposed discovery outweighs its likely benefit."). Here, all six factors show Franklin's discovery is "proportional to the needs of the case."

     [1] <u>The importance of the issues at stake in the action</u>:

     The issues in this case could not be more important to Franklin. As she explains in her attached Declaration, she has always been the primary breadwinner for her family which includes Franklin, her husband, and her two young children. In 2019, Franklin and her family moved into a new home and they were doing okay financially. *See* Doc. 31 at ¶ 2. When Franklin became disabled while pregnant with their second child she and her husband were able to put their mortgage on forbearance due to the Covid relief packages. *Id.* at ¶ 5. After Hartford wrongfully terminated her disability benefits in February 2021 based on MLS's and Dr. Parillo's review, they became unable to pay their mortgage. *Id.* at ¶¶ 7-9. The Covid forbearance then ended in February 2022. *Id.* at ¶ 9. They have struggled to pay their mortgage since then. *Id.* at ¶ 22. Thus, the "issues at stake in the action" include whether Franklin and her family will be able to remain in the family home. *Id.* Because being forced from one's home because an insurance company willfully and deliberately relies upon biased and conflicted vendors of allegedly "independent" medical reviews (*c.f. Hertz, supra*), the stakes are significant.

     Additionally, Franklin's credit has taken a beating since Hartford wrongfully terminated her benefits. For one thing, she's gone from less than $10,000 in credit card debt and $12,000 in a home equity line of credit to $72,900 in credit card debt and $36,600 on their line of credit. *See* Ex. 31 at ¶ 16, 18. Thus, their total revolving debt—now $109,500 has increased by nearly $87,500; a 500% increase.

     Franklin is also "sick every day with anxiety and worry. Wondering what will happen next month when we truly can no longer pay the mortgage or the kids' childcare." *Id.* at ¶ 22. She also worries about "How long will it take for the foreclosure process? Can we AirBnB or

rent our current home? What else can we do to keep this house we worked so hard for? If we do sell, how will it affect our future/retirement?" *Id.*.

Franklin's family also receives "constant utility shut off notices" and, further compounding her distress, she is "juggling them to keep everything turned on. Making calls, asking for assistance or extensions." *Id.* at ¶ 28. She is on "payment plans for all of my medical debt" and is paying "the minimum payments they would offer me." *Id.* at ¶ 29.

Her family's "debt is a huge stressor in my life and affects our entire family. Our marriage suffers because we cannot pay our bills and all of our credit cards are maxed out." *Id.* at ¶ 23. Consequently, Franklin is "feeling more and more depressed, wondering if my life insurance would help my family out of this whole situation if I were to die." *Id.* at ¶ 25. Franklin has also been forced to "start therapy due to my increasing desire to commit suicide," which is another emotional and financial expense wrought by Hartford's wrongful denial of her claim through its reliance on biased vendors and reviewers. *Id.*

Franklin's children have not escaped the suffering. As Franklin explains, "We couldn't even afford the hot lunch program the school started for the kids." *Id.* at ¶ 30.

The first Rule 26 factor—the tremendous stakes this claim has on Franklin's life and wellbeing—weighs heavily in favor of ordering Hartford to produce the requested reports. *Accord Coffou*, 2020 WL 1502104 at *3 ("The Court finds that the LWOP benefit [i.e. continued life insurance due to disability] for an unemployed single mom in poor health, whose capacity to hold any employment is the subject of litigation, is a valuable benefit and that her qualification for that benefit is an important issue at stake in the action."); *Jones*, 457 F.Supp.3d at 756 ("Despite assertions that the limited importance of the issues and amount in controversy are not proportional to discovery's burden, LINA makes no argument or showing of burden. LINA's argument that the LWOP benefit, which pays the policy premium for $228,000 in life insurance, is practically valueless is belied by the fact that it denied the benefit and by the amount of resources it has invested to support that denial. The Court finds that the LWOP benefit is a valuable benefit and that Plaintiff's qualification for that benefit is an important issue at stake in the action.").

[2] <u>The amount in controversy.</u>

This is a seven-figure case. Discounted to present value, Franklin's future LTD benefits are worth approximately $1.1 million. She is also owed more than $60,000 in past-due LTD benefits. The amount in controversy therefore more than justifies Franklin's requested discovery.

Because Franklin's LTD plan provides true "own-occupation" LTD benefits to age 67, there is also no reason to assume (as parties typically do for settlement purposes) that Franklin will receive SSDI benefits if she remains disabled: Her "own-occupation" standard for disability from her pharmacist occupation is vastly different from the SSDI's any-gainful-work standard for disability. But even if we assume she receives SSDI benefits, the amount in controversy does not become negligible. Instead, the discounted present value of her claim would still exceed $600,000.

Moreover, when evaluating the amount in controversy, the Court would be remiss in looking solely at the numbers, isolated from what those numbers mean to the parties. Here, without the LTD benefit she is entitled to receive, Franklin may literally become homeless or take her own life due to the financial and emotional the distress caused by Hartford's misconduct.

The second Rule 26 factor—the significant value of Franklin's denied LTD benefits—also weighs heavily in favor of ordering Hartford to produce the requested reports.

[3] <u>The parties' relative access to the relevant information.</u>

Barring an order compelling Hartford to produce the requested prior reports Franklin will have no access to the information. *See e.g. Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 675 (9th Cir. 2011) ("Usually the record does not disclose an insurance company's claims-handling history in other cases or its internal directives to claims managers about how to evaluate claims. Thus we are ordinarily ignorant of much of what we are supposed to 'weigh.'"); *see also* CITES (eight Dr. Hoenig reports and addenda, including in Franklin's case, in which he parrots the same, migraine and headache, claim-rejecting verbiage). The third Rule

26 factor—Franklin's inability to otherwise obtain relevant evidence—also weighs in favor of compelling Hartford to produce the requested reports.

[4] The parties' resources.

Hartford is a multi-billion dollar company that has likely added a billion or two dollars to its coffers through its reliance on ECN's and MLS's biased, denial-supporting reports to deny valid claims. Indeed, Hartford's current market capitalization is more than $24.5 *billion* dollars. *See* Ex. 32 at 1; *see also Coffou*, 2020 WL 1502104 at *3 ("The Court finds that LINA has the resources to respond to the discovery requests and is the only party with access to the requested discovery."); *Jones*, 457 F.Supp.3d at 756 ("The Court finds that LINA has the resources to respond to the discovery requests and is the only party with access to the requested discovery.").

By contrast, Franklin and her family are struggling financially; unable to pay their mortgage, drowning in debt, and unable to afford their kids' hot lunches at school. The fourth Rule 26 factor—Hartford's billions vs. Franklin's suffocating debt—therefore weighs in favor of compelling the company to produce the requested reports.

[5] The importance of the discovery in resolving the issues.

Post-*Hertz*, it is hard to imagine how Hartford could argue with a straight face that the production of prior reports is not of the utmost importance. At the risk of beating a dead horse, the Court's ordering Hartford to produce prior reports of MLS and the reviewing physician, and then finding that MLS and the reviewing physician said in 95% and 100% of cases, respectively, that the claimant could work, was incredibly important. *Hertz*, 991 F.Supp.2d at 1136. Indeed, as the Court explained, it "finds these statistics strongly suggest that both MLS and Dr. Rim harbored a significant bias towards finding a claimant capable of performing some type of work. In sum, Hartford's own structural conflict of interest, as well as its reliance on biased vendors, persuade the Court to review Hartford's decision to terminate Hertz's LTD benefits with significant skepticism. Moreover, it can be reasonably inferred from the following circumstances that Hartford's bias infiltrated the entire

administrative decision-making process. Accordingly, the Court shall weigh Hartford's conflict of interest more heavily." *Id.*

Then, after discussing the medical and other evidence, the *Hertz* court held, "Weighing all of the aforementioned factors together, the Court concludes that Hartford's conflict of interest improperly motivated its decision to terminate Hertz's LTD benefits. This constituted an abuse of its administrative discretion under ERISA. Accordingly, Hartford shall reinstate Hertz's LTD benefits in accordance with this Order and the terms of the Plan until such time as the administrator properly terminates said benefits according to the Plan's provisions." *Id.* at 1143. Franklin expects the same will prove true here. Thus, the fifth Rule 26 factor—the importance of establishing Hartford's, its vendors', and the reviewing physicians' biases and conflicts of interest—again weighs heavily in favor of ordering Hartford to produce the requested reports.

[6] Whether the burden or expense of the proposed discovery outweighs its likely benefit.

The burden of producing prior reports is insignificant compared to the benefits. As in *Hertz*, prior reports may prove essentially dispositive on the bias and conflict issues. *Hertz*, 991 F.Supp.2d at 1136. Combined with the numerous inconsistencies, errors, omissions, and misrepresentations in Hartford's reviews, this may also prove dispositive in terms of Franklin's entitlement to benefits. Thus, the likely benefit far outweighs any alleged burden.

Moreover, because the Court is required to consider and weigh bias and conflict evidence under Rule 56, and because the Court may be required to hold a "bench trial" if it cannot resolve the conflicts' effects as a matter of law under Rule 56, prior reports are doubly important: Without it, Franklin and the Court will be deprived of the ability to "weigh" this highly probative evidence. *Nolan v. Heald College*, 551 F.3d 1148, 1154 (9th Cir. 2009); *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 930 (9th Cir. 2012); *accord Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 675 (9th Cir. 2011); *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 968 (insurer's "parsimonious claims-granting history" is relevant to conflict analysis). Given that multiple courts have admonished plaintiffs for not presenting this type

of evidence, the benefit should be indisputable. *Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 901 (9th Cir. 2016); *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 634 (9th Cir. 2009).

Additionally, Hartford survived a similar production in *Hertz* (though that involved producing 10% of MLS's reports rather than the less than 2% of reports Franklin seeks here). Similarly, the insurance companies in *Knuth* and *Jalowsky* survived their production. In fact, there does not appear to be any case in which a large insurance company like Hartford has been truly prejudiced by such a production. Their burden arguments therefore appear to be nothing more than an effort to forestall the production of evidence they know will be relevant and incriminating.

Hartford has also expressed its knowledge that litigation and discovery is just the cost of doing business. In its 2021 Annual Report, Hartford explains that "Like any major P&C [property and casualty] insurance company, litigation is a routine part of The Hartford's business – both in defending and indemnifying our insureds and in litigating insurance coverage disputes."[10] While Hartford then identifies factors that could "cause our ultimate liabilities to change from our current expectations"—such as changes in jury awards, tort liability, coverage decisions, and "bad faith" liability (unfortunately, ERISA preempts Franklin's bad faith claims)—not listed among the "Significant changes" that could impact the company's bottom line is having to produce prior reports of its biased vendors and reviewers. *Id.* To the contrary, as the calculations discussed above show, unless the cost of Hartford's producing prior reports would run to eight or nine figures, it will still come out far, far ahead. Additionally, because Hartford is a $25 billion dollar company that has likely saved millions or billions based on biased reviews from ECN, MLS, Parillo, Marwah, and Hoenig, any alleged burden is likely minimal.[11]

---

[10] *See* https://s24.q4cdn.com/787643700/files/doc_financials/2022/ar/2022-Proxy-Statement-(1).pdf at 30.

[11] It may also be worth weighing the alleged burden of producing prior reports against the time and expense invested by both parties in the dispute over the requested production. It would not be surprising if the cost of this dispute ends up exceeding the cost of production. If Hartford is willing to invest thousands or tens of thousands of dollars to thwart relevant discovery, it shows that engaging in discovery is no financial burden on the company. This further supports the

1    Finally, numerous courts have overruled objections like Hartford's and ordered either

2    the production of prior reports or statistical information based on analysis of the prior. *Coffou*,

3    2020 WL 1502104 at *3 ("The Court further finds that the discovery ordered herein is

4    relevant and proportional to the needs of the case and that the burden or expense of the

5    discovery does not outweigh its likely benefit."); *Hertz* Doc. 36 (ordering production of 10%

6    of the reviews MLS performed for Hartford);" *Jones*, 457 F.Supp.3d at 756 ("The Court

7    further finds that the discovery ordered herein is relevant and proportional to the needs of

8    the case and that the burden or expense of the discovery does not outweigh its likely

9    benefit."); *Kroll*, 2010 WL 1233871 at *1 (ordering production of "a sampling of reports that

10   Dr. Sloan has prepared for MetLife in other disability cases"); *Santos*, 254 F.R.D. at 650 (as to

11   three physicians, ordering "statistical information concerning the number of disability claims

12   by each doctor evaluated on behalf of Hartford, including the number of times the doctors

13   concluded that a claimant was or was not disabled."); *Walker*, 585 F.Supp.2d at 1176

14   (ordering production of statistical information regarding "number of claims [MetLife] has

15   accepted or granted and rejected or denied after a review by a physician retained through

16   NMR from 2005 through 2007."); *Wilcox*, 2009 WL 57053 at *3 ("Plaintiff may conduct

17   discovery into… Defendasnt's general approval and termination rates" including "for long-

18   term disability claims involving fibromyalgia" and may "serve one set of document

19   production requests, not to exceed 10 requests").

20       All the Rule 26 factors weigh in favor of Franklin's discovery; specifically, her request

21   for up to 100 prior reports of ECN, MLS, Dr. Parillo, Dr. Marwah, and Dr. Hoenig. Without

22   it, she and the Court will be deprived of the ability to assess and weigh this highly probative,

23   potentially dispositive evidence. The Court should overrule Hartford's objections and order it

24   to produce up to 100 prior reports of ECN, MLS, and Drs. Parillo, Marwah, and Hoenig.

25

26

27   _____

28   notion that the issue is not the alleged burden of producing the *Hertz*-like discovery but, instead,
     that Hartford knows the evidence produced will be incriminating.

**II.    Request for Production No. 8: "Claim Metrics or Claim Tracking Documents."**

**1. Question Propounded.**

"For the period January 1, 2020 through the present, produce any and all claim metrics or claim tracking documents or tools that include or incorporate data or information relating to Plaintiff's claim."

*See* Ex. 33 at 4.

**2. Hartford's Response.**

"Hartford objects to this request for production as the information sought on claim metrics and claim tracking documents or tools as it relates to Plaintiff's claim is overly broad and beyond the reasonable scope of discovery in this ERISA case. Hartford further objects as the information sought may be proprietary and confidential and constitute trade internal trade secret documentation. Notwithstanding said objection, Hartford states that the claim documentation that was reviewed for purposes of making a claim decision on Plaintiff's claim is contained in the Administrative Record that has been produced."

*See* Ex. 33 at 4-5.

**3. Reasons Response is Deficient.**

Hartford's response is deficient for multiple reasons, including that claim metric and tracking documents may indicate "internal directives to claims managers about how to evaluate claims." *Salomaa*, 642 F.3d at 675. Because "the record does not disclose" this information, it is only available through discovery. *Id.*

In previous cases in which Franklin's counsel was counsel for the plaintiff, claim metric/tracking evidence proved to be probative of bias and internal claims-handling directives. For example, the claim "Directors" for another insurer, Unum, are responsible for ratifying adjuster recommendations about whether to approve or deny a claim. Those same claim-responsible Directors are also provided with multiple tracking documents that include specific claim-related targets.

One of those documents Unum provides to its Directors is a "Weekly Tracking" document which includes data about "LAR" or Liability Acceptance Rate—meaning the percentage of claims Unum approves—and informs the Director of her weekly and quarterly "Actual" LAR and her corporate-set "Plan" for LAR. *See* Ex. 39 at 7 (*i.e.* "p. 63 of 1677"). It also informs the claim-responsible Directors about her "Actual" and "Plan" for claim "Recoveries," meaning claims that are either open and then closed or which are denied upon a new application.

| Data | DEC14 | |
|---|---|---|
| | ACTUAL | PLAN |
| Paid Recoveries * | 34,234 | |
| Inventory (#) | 228 | 246 |
| Recoveries (#) | 134 | 161 |
| 0-12 Mos | 56 | 46 |
| 13-24 Mos | 13 | 16 |
| 25-36 Mos | 14 | 11 |
| 37-60 Mos | 4 | 7 |
| 61-120 Mos | 7 | 5 |
| 121 + Mos | 228 | 246 |
| Recovery - Total | 11 | 12 |
| Recoveries / Day | | |
| Actual to Plan % | 92.7% | 100.0% |
| Paid Reopens ** | | |
| # Reopen | 32 | 34 |
| Rate % | 14.0% | 13.7% |
| LAR - Current | | |
| # Decisions | 600 | 615 |
| # Approvals | 485 | 511 |
| LAR - Total % | 80.8% | 83.0% |

*Id.*.[12] It would not be a stretch to find that an insurance company's telling a claim-responsible Director, who supervises a team of claim adjusters, that her team's "Actual" LAR and Recoveries are below "Plan" could influence the way claims are adjusted. This type of evidence is equally relevant here.

As another example, Unum also provides its claim Directors with a "Director Scorecard" that literally red-flags them if have too many claim "Reopens" versus their

---

[12] Although Unum initially designated the *Knuth* Weekly Tracking and Scorecard documents as confidential and subject to the Court's Protective Order, they were later ordered unsealed and became part of the public record. *See* Ex. 40 at 2.

"Expectation," meaning too many claims that had been denied or terminated and that were approved or "Reopened" on appeal:

| Quantitative Metrics (Updated Weekly) | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Metric | Expectation | QTR 1 AVG | QTR 2 AVG | QTR 3 AVG | Oct | Nov | Week 1 | Week 2 | Dec Week 3 | Week 4 | Week 5 | Dec (MTD) | Q4 AVG (QTD) | YTD AVG | Y BO / |
| . . . | | | | | | | | | | | | | | | |
| Reopen - # Claims | N/A | 3 | 3 | 2 | 1 | 1 | 2 | 1 | 1 | 2 | 1 | 1 | 1 | 2 | 42 |
| Reopen - # Claimants | N/A | 2 | 1 | 2 | 1 | 1 | 2 | 1 | 1 | 2 | 1 | 1 | 1 | 2 | 32 |
| Reopen Rate | <=10% | 25% | 15% | 11% | 4% | 7% | 100% | 50% | 20% | 25% | 10% | 6% | 13% | 12% | |
| Liability Acceptance Rate | N/A | 91% | 92% | 92% | 96% | 96% | 100% | 100% | 100% | 93% | 94% | 95% | 92% | 88% | |

*See* Ex. 39 at 3 (*i.e.* "p. 47 of 1677"). As Unum's "Key" informs its Directors, the red-flagged entries indicate they are "Below Plan":

| KEY | | |
|---|---|---|
| At or Above Plan | NearPlan / Trend Alert | Below Plan |

*Id.* As one final example, Unum also informs its Directors on a weekly basis about their "Projection" for claim "Recoveries," their "momentum" toward that Projection, their "Actual" number of claim Recoveries to date, and the "Gap" between their Projection and expected number of claim Recoveries. *See* Ex. 41 at 2. It also informs them about their Actual and Gap in Recoveries versus the corporate-set "Plan" for their team's Recoveries:

| Denise's Team | Projection | Week 1 momentum | Actual | Gap |
|---|---|---|---|---|
| Jessica | 20 | 4 | 1 | 3 |
| Judy | 12 | 2 | 1 | 1 |
| Adam | 16 | 3 | | 3 |
| Joe | 12 | 2 | 1 | 1 |
| Lynn | 10 | 2 | 1 | 1 |
| Liz | 11 | 2 | | 2 |
| Totals | 81 | 16 | 4 | 12 |

| Denise's Team | Plan | Week 1 momentum | Actual | Gap |
|---|---|---|---|---|
| Jessica | 15 | 3 | 1 | 2 |
| Judy | 11 | 2 | 1 | 1 |
| Adam | 16 | 3 | | 3 |
| Joe | 10 | 2 | 1 | 1 |
| Lynn | 11 | 2 | 1 | 1 |
| Liz | 16 | 3 | | 3 |
| Totals | 79 | 16 | 4 | 12 |

-24-

1    *Id.*[13]

2         Like other evidence showing Hartford's and its reviewers' biases and conflicts, internal

3    claim metrics and tracking documents may prove highly probative. For example, in *Glenn*, the

4    Supreme Court noted that a conflict may prove "more important (perhaps of great

5    importance) where circumstances suggest a higher likelihood that it affected the benefits

6    decision… It should prove less important (perhaps to the vanishing point) where the

7    administrator has taken active steps to reduce potential bias and to promote accuracy, for

8    example, by walling off claims administrators from those interested in firm finances, or by

9    imposing management checks that penalize inaccurate decisionmaking irrespective of whom

10   the inaccuracy benefits." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008). In the case of

11   Unum, the claim tracking documents show that 1) Unum's financial interests infect the

12   claims-handling process; and 2) Claim-responsible personnel are *not* walled off from interest

13   in firm finances. Instead, by repeatedly reminding claim-responsible Directors of their

14   "Actual" vs. "Plan" for claim "Recoveries," "LAR," and claim "Reopens," Unum ensures

15   that interest in firm finances is an ever-present consideration.

16        Here, internal Hartford claim metrics and tracking documents may prove equally

17   probative. For example, if Hartford also instructs claim Directors or managers about their

18   "Plan" for metrics like claim approvals/LAR and claim denials/Recoveries, that would be

19   relevant to the Court's *Abatie/Glenn* analysis. *Salomaa*, 642 F.3d at 675 (noting relevance of

20   "internal directives to claims managers" that would not be included in the administrative

21   record); *Gray v. Unum Life Ins. Co. of Am.*, 2018 WL 4566850 *4 (C.D. Cal. 2018) (overruling

22   Unum's objection to producing claim metric/tracking documents because "Plaintiff's

23   Requests for Production regarding… whether Defendant Unum's decision to terminate

24   Plaintiff's plan for reasons other than the merits of Plaintiff's claim" were "relevant").

25

26   ———————————————

27   [13] After the plaintiff challenged Unum's designation of this document during discovery, Unum
     withdrew its initial confidentiality designation and the document became part of the public record.

28   *See* Ex. 42.

Hartford's two specific objections—that the request was "overly broad and beyond the reasonable scope of discovery in this ERISA case" and that "the information sought may be proprietary and confidential and constitute trade internal trade secret documentation"—should also be overruled.

First, Franklin's request is not overly broad or beyond the reasonable scope of discovery in ERISA disability cases. Again, *Salomaa* addressed this issue and found evidence such as "internal directives to claims managers" are relevant. *Salomaa*, 642 F.3d at 675. This may also fall into the types of evidence the *Demer* and *Montour* courts would criticize plaintiffs for not submitting for the Court's consideration. *Demer*, 835 F.3d at 903; *Montour*, 588 F.3d at 634. Additionally, Franklin is not asking for *all* internal metrics and tracking documents; only those "that include or incorporate data or information relating to Plaintiff's claim." *See* Ex. 33 at 4.[14] This further counsels against Hartford's objection. And if a bench trial on the conflicts' effects becomes necessary under *Nolan* and *Stephan*, *supra*, this type of claim metric/tracking evidence could be highly probative of bias. The objection should be overruled.

The ERISA regulations also counsel in favor of Franklin's request. Under § (b)(7) of the regulations, Hartford must ensure that "decisions regarding hiring, compensation, termination, promotion, or other similar matters… must not be made based upon the likelihood that the individual will support the denial of benefits." 29 C.F.R. § 2560.503-1(b)(7). In the case of the Unum documents discussed above, employee testimony in another case shows that Directors' ability to meet their claim metrics is considered when determining bonus compensation. *See* Ex. 43 at 127:3-15. (p. 2 of PDF). Consequently, such evidence is relevant to determining whether an insurance company is pressuring employees to close claims and is therefore violating its regulatory obligations.

It is also questionable whether Hartford's omitting any metric/tracking documents from Franklin's claim file is permissible. The ERISA regulations require Hartford to include all "relevant" documents in Franklin's claim file. 29 C.F.R. § 2560.503-1(j). The regulations

---

[14] If Franklin's claim had been handled by Unum, for example, her data would have been included in the claim "LAR," "Recovery," and "Reopen Rate" data for the relevant time periods.

-26-

define "relevant" documents as including any information that was "submitted, considered, *or generated* in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination." 29 C.F.R. § 2560.503-1(m)(8)(ii) (emphasis added). Because any metric/tracking documents that incorporate data about the approval or denial of Franklin's claim would have been "generated in the course of making the benefit determination," they should have been included in her claim file. *Id.*

Second, Hartford's "proprietary and confidential" objection is resolved by the Court's Protective Order, Doc. 39. *See e.g. Gray*, 2018 WL 4566850 (C.D. Cal. 2018) ("Plaintiff's Motion to Compel further responses to Requests for Production, Nos. 2-5 is GRANTED subject to a protective order limiting public disclosure of the documents and use for any purpose other than prosecuting this litigation."). Hartford's internal claim metrics and tracking documents are not core trade secrets like the formula for Coke or Apple's source code. It is routine business information that is produced throughout the country subject to a protective order on a routine basis.

Furthermore, Hartford's "proprietary and confidential" objection contravenes its representations in the parties' *Joint Stipulation and Motion for Protective Order*, Doc. 38. In that filing, Hartford and Franklin noted that "the parties anticipate exchanging discovery… which will involve the production of information that the producing parties assert is confidential… proprietary, trade secret, commercial, financial and/or business information." The parties further noted that to "proceed expeditiously in providing discovery responses and obtaining releases for information, while still maintaining the confidential nature of the documents and information therein *and minimizing discovery disputes over the production of confidential information*," the parties jointly stipulated to the entry of a mutually agreed-upon protective order. *Id.* at 1:23-26 (emphasis added). Finding a PO would be helpful, the Court granted the parties' *Joint Stipulation and Motion* to "expedite the flow of discovery material" and "facilitate the prompt resolution of disputes over confidentiality." Doc. 39 at 1:15-16. Now, however, Hartford appears to view the representations made in the *Joint Stipulation and Motion*, and the Court's

findings on that filing, differently. Hartford's refusal to produce the requested metric/tracking documents by claiming it is confidential is unsupportable and contrary to its prior representations. The objection should be overruled.

Finally, and for the same reasons discussed above addressing the Rule 26 proportionality factors—importance of the issues at stake, amount in controversy, parties' relative access to the evidence, parties' resources, importance of the discovery, and burden versus likely benefit—the requested discovery is more than proportional to the needs of the case, especially in light of the Court's potential obligation to consider it at a bench trial under *Nolan* and *Stephan*, *supra*.

## III.    Direct Request: Depositions of Adjusters Alli Porter and Jackson Pitzer.

### 1. Question Propounded.

On November 30, 2022, Franklin emailed Hartford's counsel stating she "would like dates in February or early March to depose Alli Porter and Jackson Pitzer regarding conflict of interest and bias issues."

### 2. Hartford's Response.

Hartford has stated it will not be producing any witnesses for deposition.

### 3. Reasons Response is Deficient.

Depositions of the Hartford claim adjusters who denied Franklin's claim (Porter) and her appeal (Pitzer) are necessary to investigate the manners in which Hartford's, its vendors', and its employees' and consultants' biases and conflicts of interest infected the claim process and drove the company's decisions. Multiple courts within the Ninth Circuit, including the Ninth Circuit itself, have either criticized plaintiffs for failing to take bias and conflict depositions or have overruled defense objections to such depositions.

In *Demer*, for example, the court criticized the plaintiff because he failed to take depose the administrator, holding: "Mr. Demer did not explain his failure to take a 30(b)(6) deposition on the structural conflict issue." *Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 901 (9th Cir. 2016). In *Wilcox*, the Ninth Circuit reversed the District Court's decision prohibiting

discovery and ordered the court to reconsider that order in light of *Abatie* and *Glenn*. *Wilcox v. Wells Fargo and Co. Long Term Disability Plan*, 287 Fed.Appx. 602 at *2 (9th Cir. 2008) (*citing Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 967, 970; *Metro. Life Ins. Co. v. Glenn*, 128 S.Ct. 2343 (2008); *Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 949-50 (9th Cir. 2007)). On remand, the District Court found depositions were appropriate in light of the Ninth Circuit's directives. *Wilcox*, 2009 WL 57053 at * 2-3 ("the Court cannot fully evaluate the nature and effect of a structural conflict without considering some evidence regarding the conflict— evidence not likely to be found in the administrative record… Plaintiff may take three depositions."). Numerous other courts throughout the Ninth Circuit have likewise found that bias and conflict depositions are necessary and appropriate and have therefore overruled the defense objections. *See e.g. Fowler v. Aetna Life Ins. Co.*, 615 F.Supp.2d 1130, 1135-36 (N.D. Cal. 2009) ("To ensure a full bias inquiry, the Court will hold an evidentiary hearing and allow plaintiff to conduct limited conflict-of-interest discovery… Plaintiff requests limited discovery, including depositions… the requested discovery is appropriate… the intent of the depositions is to probe the extent of Aetna's conflict of interest."); *Eisner*, 2013 WL 10903701 at *3 ("Plaintiff seeks the ability to take three depositions… The Court disagrees that Plaintiff has not demonstrated the need for these depositions."); *Gray v. Unum Life Ins. Co. of Am.*, 2018 WL 4566850 at *6 (C.D. Cal. 2018) ("As stated above, Plaintiff may seek discovery requests, like the Depositions at issue here, to demonstrate a conflict of interest in Defendant Unum's termination of Plaintiff's plan."); *Santos*, 254 F.R.D at *649-50 (Rule 30(b)(6) deposition categories "relat[ing] to efforts to reduce bias, promote accuracy and wall off administrators are appropriate for discovery."); *Toven v. Metro. Life Ins. Co.*, 517 F.Supp.2d 1174, 1176 (C.D. Cal. 2007) ("The Ninth Circuit has articulated its approval of allowing the use of evidence outside the administrative record when engaging in conflict of interest inquiries in ERISA cases [citing *Abatie*]. The Magistrate Judge's order allowing the three depositions to go forward is not inconsistent with *Abatie* and its progeny. Consequently, the Magistrate Judge's order was not clearly erroneous or contrary to law. Therefore, the

1  Magistrate Judge's Order Denying Defendant's Motion for a Protective Order is
2  AFFIRMED.").

3     Additionally, and as explained in Franklin's *Motion*, the Ninth Circuit requires the Court
4  to hold a "bench trial" if it cannot determine the bias and conflict effects as a matter of law
5  on summary judgment. *Nolan*, 551 F.3d at 1155; *Stephan*, 697 F.3d at 930. Hartford's
6  objection to Franklin's request for depositions of the adjusters who decided her claim and
7  appeal is also deficient because it would deprive Franklin of the ability to obtain and present
8  relevant bias and conflict evidence to the Court; either on motions for summary judgment or,
9  potentially, at the *Nolan*-required bench trial. *Id.* Hartford's objection to producing the two
10 adjusters who denied Franklin's claim and appeal should be overturned.

11 **IV.    Conclusion.**

12    Hartford's objections are ill-founded and contrary to the overwhelming case law. They
13 also contravene the Ninth Circuit's directives in *Demer*, *Montour*, *Abatie*, and *Salomaa*, and
14 would undermine the Court's ability to consider some of the most probative bias and conflict
15 evidence under *Nolan* and *Stephan*. The Court should therefore overrule Hartford's objections
16 and order the company to produce, without delay:

17    1.  A maximum of 100 prior disability review reports Hartford received from
18        following entities or persons:
19        a.  ECN
20        b.  MLS
21        c.  Dr. Parillo
22        d.  Dr. Marwah
23        e.  Dr. Hoenig
24    2.  Produce claim metric and tracking information which includes or incorporates
25        data or information relating to Franklin's claim.
26    3.  Produce the claim adjusters who denied Franklin's claim and appeal, Alli Porter
27        and Jackson Pitzer, for deposition.

28

DATED November 3, 2022

LAW OFFICE OF PATRICK MAUSE, PLLC

By: _s/ Patrick W. Mause_
    Patrick W. Mause
    Attorney for Plaintiff