Patrick W. Mause (SBN 024269)
Law Office of Patrick Mause, PLLC
1830 East Broadway, Suite 124-302
Tucson, AZ 85719
(520) 342-0000
(520) 342-0001 (fax)
Patrick@PMauseLaw.com

*Attorney for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sabrina Franklin,<br><br>                                           Plaintiff,<br><br>v.<br><br>Hartford Life and Accident Insurance Company;<br><br>                                           Defendant. | Case No. CV-22-168-TUC-JAS<br><br>**PLAINTIFF'S OBJECTION TO HARTFORD'S DESIGNATING VENDOR AND FILE REVIEWER PAYMENTS AND NUMBER OF REVIEWS PERFORMED AS CONFIDENTIAL**<br><br>**(Oral Argument Requested)** |

During discovery, and to help illuminate Hartford's and its consultants' ERISA-related biases and conflicts of interest, plaintiff Sabrina Franklin asked Hartford to disclose for the years 2020 and 2021:

- The number of reviews Hartford received from the vendors it hired to obtain the paper-only file reviews it relied upon to terminate Franklin's claim and deny her appeal, ECN and MLS;

- The number of paper-only file reviews Hartford received from the physicians who performed those reviews, Drs. Lucien Parillo, Rajendra Marwah, and David Hoenig; and

- The amounts Hartford paid for those reviews.

*See* Ex. 33 to Plaintiff's Motion to Compel, Doc. 42 at 10-12.[1]

---

[1] To avoid additional and duplicative sealed filings, Franklin refers the Court to the previously-filed copy of Hartford's discovery responses, incorporated herein by reference. If the Court would like Franklin to resubmit Hartford's discovery responses in connection with this *Objection* she is more than happy to do so.

When Hartford disclosed that information it improperly designated it as confidential and subject to the Court's *Stipulated Protective Order* ("PO"). *Id.*; *see also* PO, Doc. 39. Franklin thereafter objected to that confidentiality designation and, following the parties' meet-and-confer efforts, they were unable to resolve their disagreement. Accordingly, and because Hartford cannot establish the requisite "good cause" to override the public's presumptive right to access to these judicial materials, Franklin files this *Objection. See* Doc. 39 at 6 ¶ 11 ("At any stage of these proceedings, any party may object to a designation of materials as Confidential Information."). For multiple reasons, the Court should sustain Franklin's objection and hold that the number of reviews Hartford's vendors and file review physicians performed in the years 2020 and 2021, and the amounts Hartford paid for those reviews, does not qualify for confidentiality.

## I.     The "Good Cause" Standard to Keep Discovery Documents Confidential Is Exacting — It Is Not a 'No Cause' or 'Some Cause' Standard.

Judicial documents, including "the fruits of pretrial discovery," are "presumptively public." *San Jose Mercury News, Inc. v. U.S. Dist. Court—N. Dist. (San Jose)*, 187 F.3d 1096, 1103 (9th Cir. 1999). Consequently, before a court can sign-off on a litigant's attempts to seal judicial documents and override the public's presumptive right of access to those materials, several criteria must be met.

First, the party seeking to override the public's presumptive right of access to judicial documents must demonstrate "good cause" to seal the documents. *Id.* Importantly, this is not a "no cause" or "some cause" standard. To the contrary, it requires the party seeking to abrogate the public's presumptive rights to make a "particularized showing of good cause with respect to any individual document." *Id.*

Second, "[b]road allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test" for confidentiality. *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992) (quoting *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1121 (3rd Cir. 1986)). In other words, the party seeking confidentiality must show it will

suffer "specific prejudice or harm" if an allegedly confidential document is not sealed. *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1210-1211 (9th Cir. 2002). Absent such a "particularized showing," the default rule of access prevails—the documents must remain public. *San Jose Mercury News*, 187 F.3d at 1103 (*citing Beckman*, 966 F.2d at 476; *Public Citizen v. Liggett Group, Inc.*, 858 F.2d 775, 790 (1st Cir. 1988)).

Third, the party advocating confidentiality may not override the public's presumptive rights by resting on the fact that one type of document was previously found to be confidential. *Foltz*, 331 F.3d at 1130 ("A party asserting good cause bears the burden, for each particular document it seeks to protect, of showing that specific prejudice or harm will result if no protective order is granted."). Thus, even if a related or similar document were found to contain a protectible trade secret in another case, the party seeking to override the public's presumptive rights to a similar or different document must still make a "particularized showing" as to that specific document in the present case. *San Jose Mercury News*, 187 F.3d at 1103.

Fourth, the burden is not on party challenging confidentiality to justify the public's right of access. *Phillips*, 307 F.3d at 1210-1211. Rather, "the party seeking protection bears the burden of showing specific prejudice or harm will result if no protective order is granted." *Id.* This Court's PO, in fact, recognizes this, providing: "In any challenge to the designation of materials as Confidential, the burden of proof shall be on the party seeking protection." *See* Doc. 39 at 6:13-15. Thus, even if a court is not persuaded by a challenger's arguments, the default rule that "the fruits of discovery" are public prevails if the party seeking confidentiality fails to show it will suffer "specific prejudice or harm" if a document is not sealed. *Id.*; *San Jose Mercury News*, 187 F.3d at 1103.

Finally, before a court can abrogate the public's presumptive right of access to judicial materials, the court must analyze the party's arguments and, if it finds confidentiality warranted, "identify and discuss the factors it considered in its 'good cause' examination." *Phillips*, 307 F.3d at 1212; *Foltz*, 331 F.3d at 1130. If a court is unable to make such findings

1   or is unable to identify the specific harm the litigant will suffer if a document is not sealed the

2   default rule remains in effect: The document is public. *Id.*; *Foltz*, 331 F.3d at 1130.[2]

3       While some commercial information like the formula for Coke, Michelin's tire rubber

4   formulas, or Apple's crown jewel source code are likely to meet these exacting standards, not

5   every business document is protectible. Indeed, the fact that a document was generated in the

6   course of a company's business is inadequate. *Kamakana v. City & Cty. of Honolulu*, 447 F.3d

7   1172, 1179 (9th Cir. 2006); *Beckman*, 966 F.2d at 476; *Phillips*, 307 F.3d at 1210-1211.

## II.   That A Document Would Be Incriminating Is Not "Good Cause."

9       It is not uncommon for companies to create embarrassing or incriminating documents

10  during the course of business. This is not enough to override the public's presumptive rights

11  of access to judicial materials, however. As the *Kamakana*, court held: "The mere fact that the

12  production of records may lead to a litigant's embarrassment, incrimination, or exposure to

13  further litigation will not, without more, compel the court to seal its records." *Kamakana*, 447

---

[2] *See also Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101–02 n. 16 (1981) (courts have insisted on a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements" (quotations and citations omitted); *In re Terra International, Inc.*, 134 F.3d 302, 306 (5th Cir. 1998) (motion for protective order denied where party "made nothing more than a conclusory allegation" and "did not support is motion for protective order with any affidavits or other evidence"); *General Dynamics Corp. v. Selb Mfg. Corp.*, 481 F.2d 1204, 1212 (8th Cir. 1973) ("good cause" for issuance of protective order requires "a particularly and specific demonstration of fact, as distinguished from stereotyped and conclusory statements"); *Patt v. Family Health Systems, Inc.*, 189 F.R.D. 518, 523 (E.D. Wis. 1999) ("Finally, Family Health Plan also fails to meet the specificity requirement for a showing of good cause. Without any indication of a clearly defined and serious injury, the court is unwilling to issue a protective order for general or merely speculative damage."); *Gray v. First Winthrop Corp.*, 133 F.R.D. 39, 40 (N.D. Cal. 1990) (doing "no more than to argue in a conclusory fashion" does not constitute "good cause" to warrant a protective order); *J.T. Baker, Inc. v. Aetna Casualty and Surety Co.*, 135 F.R.D. 86, 90 (D.N.J. 1989) (to justify protective order, "the harm must be significant, not trivial" (*citing Cipollone v. Ligett Group, Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986), *cert. denied*, 484 U.S. 976 (1987)); *Hunter v. International Systems & Controls Corp.*, 51 F.R.D. 251, 255-56 (D.Mo. 1970) (if defendant contends documents contain "trade secrets" it must provide "specific statements respecting each item of allegedly confidential information, showing the prejudice which could result from its discovery."); *Essex Wire Corp. v. Eastern Electric Sales Co.*, 48 F.R.D. 308, 311 (E.D. Pa. 1969) ("defendants have not shown that divulgence of this information to the public would result in a clearly defined injury to the defendants").

F.3d at 1179 (*citing Foltz*, 331 F.3d at 1136); *see also Culinary Foods, Inc. v. Raychem Corp.*, 151 F.R.D. 297, 301 (N.D. Ill.), *order clarified,* 153 F.R.D. 614 (N.D. Ill. 1993) ("Although the information regarding the hazards of products and the corporation's knowledge of the information may be embarrassing and incriminating, this alone is insufficient to bar public disclosure."); *Wauchop v. Domino's Pizza, Inc.*, 138 F.R.D. 539, 546 (N.D. Ind. 1991) ("A claim, such as that made by Domino's, that public disclosure would be harmful to the defendant's reputation, is not sufficient." (citation omitted)); *Nestle Foods Corp. v. Aetna Cas. & Sur. Co.*, 129 F.R.D. 483, 486 (D.N.J. 1990) ("The courts have emphatically held that a protective order cannot be issued simply because it may be detrimental to the movant in other lawsuits." (citations omitted)).[3] Thus, although Hartford may believe its heavy reliance on ECN, MLS, and Drs. Parillo, Marwah, and Hoenig may be incriminating or impair its defenses in other lawsuits, that is insufficient to deprive the public of its presumptive rights of access.

Indeed, the court in *Culinary Foods* correctly noted that the incriminating nature of a document, absent the exacting proof required to justify confidentiality, should weigh *against* confidentiality: "Where products are indeed hazardous, information concerning the dangers of the products and the corporation's lack of action to prevent the dangers or its attempt to conceal the dangers should not be subject to protection under Rule 26(c)." *Culinary Foods*, 151 F.R.D. at 301. While Hartford may argue that its product—long-term disability insurance—is not "hazardous," that is not the case. Biased, wrongful, and bad faith disability decisions like Hartford's can have grave consequences. In the *Stoker* case, for example, Hartford's biased disability claims-handling caused the insured to decompensate, attempt suicide, and be committed for inpatient psychiatric treatment. *Stoker v. Hartford Life & Accident Ins. Co.*, 355 F. Supp.3d 893, 896 (D. Ariz. 2019) (denying motion to dismiss where complaint credibly alleged the insured "decompensated, attempted suicide by overdosing on prescription medications, and was committed for inpatient psychiatric care" after Hartford mishandled

---

[3] In *Foltz*, the Ninth Circuit cited *Nestle Foods*, *Wauchop*, and *Culinary Foods* in holding that incriminating or embarrassing information, "without more," is insufficient to seal judicial records. *Foltz*, 331 F.3d at 1136.

her LTD claim). In *Ace*, the insured was "forced to sell much of her personal property and her home" and "sent her eldest son to live with another family and she lived in her car" after her disability benefits were terminated in bad faith. *Ace v. Aetna Life Ins. Co.*, 139 F.3d 1241, 1246 (9th Cir. 1998), *as amended on reh'g* (Mar. 12, 1998).[4] And in the *Leavey* case, the insured dentist smashed his hand with a 45-pound weight after his disability insurer wrongfully terminated his benefits. *Leavey v. UNUM/Provident Corp.*, 2006 WL 8445652, at *1 (D. Ariz. June 22, 2006).

As the Sixth Circuit observed in a tobacco industry lawsuit, "common sense tells us that the greater the motivation a corporation has to shield its operations, the greater the public's need to know." *Brown & Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165, 1180 (6th Cir. 1983). Thus, "a court should not seal records unless public access would reveal legitimate trade secrets, a recognized exception to the right of public access to judicial records." *Id.* (emphasis added); *accord Culinary Foods*, 151 F.R.D. at 301 ("Furthermore, where trade secrets are not at issue, common sense would indicate that the greater a corporation's motivations for secrecy, the greater the public's need to know" (citing *Brown & Williamson*)).

Over the past several years, corporate defendants have abused courts' protective orders to shield their non-confidential misconduct from the public. For example, opioid manufactures abused the protective order process to hide their misconduct while continuing to profit at the public's expense. *See e.g.* https://www.reuters.com/investigates/special-report/usa-courts-secrecy-judges/ (criticizing corporate defendants' abuse of confidentiality and protective orders and noting that in one case, "[i]t would be 12 years — and 245,000 overdose deaths" before allegedly confidential information that had been "kept hidden" under a protective order "was made public, and then only after it was leaked to a newspaper."). Goodyear similarly relied upon protective orders to hide evidence of its deadly tire failures and thereby delay remedial action; again while profiting off its misconduct. *See* https://static.nhtsa.gov/odi/inv/2017/INOA-PE17009-5650.PDF (NHTSA bulletin stating

---

[4] In another case Franklin's counsel handled, Hartford's insured lost her home and was forced to sleep in her car at a truckstop after her benefits were denied in bad faith.

the investigation into the Goodyear G159 tire was delayed because "the data produced in litigation was sealed under protective orders and confidential settlement agreements, precluding claimants from submitting it to NHTSA.");

https://autoweek.com/article/recalls/nhtsa-probes-goodyear-tires-may-have-caused-dozens-deaths-or-injuries (noting NHTSA's investigation of the Goodyear G159 tire, which "may have caused 95 injuries and deaths," "began only recently when previously sealed documents were unsealed by a court"); *accord Haeger v. Goodyear Tire & Rubber Co.*, 906 F. Supp. 2d 938, 941 (D. Ariz. 2012), *aff'd,* 793 F.3d 1122 (9th Cir. 2015), and *aff'd,* 813 F.3d 1233 (9th Cir. 2016), and *vacated and remanded,* 869 F.3d 707 (9th Cir. 2017) (imposing sanctions due to Goodyear's failure to disclose test results relating to the G159 tire it had produced, confidentially, in other cases). The amounts Hartford has showered upon its vendors and reviewers, though incriminating, do not qualify for confidentiality. Hartford should not be permitted to abuse this Court's *Stipulated Protective Order* to shield its misconduct from the public.

### III.   Disability Insurers' File Review Largesse Has Been Repeatedly Disclosed By Courts.

That disability insurance companies lavish money on their vendors and reviewers for biased, paper-only file reviews is hardly groundbreaking news. Indeed, multiple courts have reported on exactly this issue, with specific dollar amounts, including in multiple Hartford cases:

- *Kurth v. Hartford Life & Acc. Ins. Co.*, 845 F. Supp. 2d 1087, 1096 (C.D. Cal. 2012)
  - "From the end of 2004 to February 2006, Defendant [Hartford] referred to UDC an average of 200 to 250 claims per month. As of February 2006, UDC derived 70 to 75 percent of its overall revenue from Defendant."
  - "From 2007 to 2009, the year when Plaintiff's benefits were terminated, Defendant's referrals to MES increased from 673 to 1,496 claims, and the amount billed by MES for these referrals almost tripled from about $0.5 million in 2007 to roughly $1.5 million in $2009."

- *Caplan v. CNA Fin. Corp.*, 544 F. Supp. 2d 984, 990 (N.D. Cal. 2008):
  - "UDC provides review services to Hartford pursuant to a contract. As of February, 2006, close to seventy-five percent of UDC's revenue was derived from Hartford."
  - "UDC initially charged $300 per hour for its physicians to review disability files, but its hourly charge to Hartford under a 2002 contract was reduced to $225 per hour in what UDC owner Jonathan Strang described as a 'volume discount type arrangement.'"
  - "UDC's gross revenue increased between fifty and one hundred percent from 2002 to 2004 after it signed its contract with Hartford. Since 2002, Hartford has paid UDC more than thirteen million dollars for review services."
  - "Dr. Mahawar has performed chart reviews for UDC on a number of occasions, producing 217 evaluations for 202 Hartford claimants between January 1, 2005, and September 30, 2007."
- *Nolan v. Heald Coll.*, 551 F.3d 1148, 1152 (9th Cir. 2009):
  - "The evidence indicates that MetLife paid Network Medical Review $236,490 in 2002, $569,795 in 2003, $838,265 in 2004, and $1,671,605 in 2005 for these independent medical opinions."
  - "Dr. Jares performed 352 medical reviews for MetLife in 2005 and received at least $37,050 for those services. Jares derived 30% of his 2005 income from doing independent medical reviews for Network Medical Review."
  - "Dr. Silver performed 98 medical reviews for MetLife in 2005, and roughly 82% of his time was spent performing independent medical reviews for Network Medical Review, for which he was paid $75,945."
- *Walker v. Metro. Life Ins. Co.*, 585 F. Supp. 2d 1167, 1175 (N.D. Cal. 2008):
  - "Most importantly, the record was developed and the decision was made largely in reliance upon NMR, a company MetLife knows benefits financially from doing repeat business with it. NMR received more than $11 million from MetLife between 2002 and 2007."
  - "As to the number of claims referred to NMR, MetLife stated it referred 3,593 claims in 2007, 3,159 claims in 2006, and 2,304 claims in 2005."
- *Lavino v. Metro. Life Ins. Co.*, 2010 WL 234817, at *8 (C.D. Cal. Jan. 13, 2010):
  - "In 2002, NMR performed 370 reviews for MetLife for which it was paid $236,490."

- o "In 2005, NMR reviewed 1,197 reviews for MetLife and was paid NMR $1,671,605."
- o "Plaintiff also submits verified interrogatories from NMR, which state, in contradiction to Porter's declaration that in 2005, MetLife referred 3,209 claims to NMR for which paid NMR $2,063,890."
- o "Further, in 2006, NMR performed 4,441 claims and paid NMR $2,780,795."

In *Demer*—in which the Ninth Circuit made clear that bias and conflict discovery is not only relevant in ERISA disability cases but that a plaintiff is remiss for not seeking such information—the court noted that the insurer's file review largesse raised a "fair inference" that the financial conflict "influenced" the reviewers' opinions. *Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 902 (9th Cir. 2016). As the court noted, "Mr. Demer has offered evidence that the IPCs have earned a substantial amount of money from MetLife ($125,000–$175,000 each year) and have performed a substantial number of reviews for the company as well (200–300 reviews/addendums each year). The magnitudes of these numbers, particularly when combined, raise a fair inference that there is a financial conflict which influenced the IPCs' assessments, and thus such conflict should be considered as a factor in reviewing MetLife's decision for abuse of discretion." *Id.* Given that these numerical and financial cats are very much out of their bags, it is difficult to comprehend how Hartford can claim confidentiality here.

## IV. Hartford Cannot Meet the Ninth Circuit's Standard to Deprive the Public of Their Presumptive Right of Access to the Court's Judicial Materials.

For multiple reasons, Hartford cannot meet its burden to show the number of file reviews it received from ECN, MLS, and Drs. Parillo, Marwah, and Hoenig, or the amounts it paid for those reviews, are entitled to confidentiality.

### A. Despite Multiple Courts Including Payment Information in Decisions, the Disability Insurance Industry Continues to Profit.

As discussed above, multiple court have publicly disclosed the amounts different disability insurers, including Hartford, have paid for vendor and file reviews. *Kurth*, 845 F.

1   Supp. 2d at 1096; *Caplan*, 544 F. Supp. at 990; *Nolan*, 551 F.3d at 1152; *Walker*, 585 F.

2   Supp. 2d at 1175; *Lavino*, 2010 WL 234817 at *8; *Demer*, 835 F.3d at 902. While Hartford

3   claims on the one hand that the Court should override the public's presumptive right of

4   access to judicial documents because it would be harmed if its munificence is not shielded, on

5   the other hand it continues to show huge profits notwithstanding the information's

6   disclosure. Indeed, since January 2012, the stock price of Hartford's parent company,

7   Hartford Financial Services Group, Inc. has nearly quadrupled.

8

9

10   

11

12

13

14

15

16   *See e.g.* https://finance.yahoo.com/quote/HIG?p=HIG&.tsrc=fin-srch (last visited March

17   22, 2023); *see also* Doc. 8 (Hartford corporate disclosure statement stating Hartford Life "is a

18   wholly owned subsidiary of The Hartford Financial Services Group, Inc. (NYSE: HIG).").

19   Any "*but it would be harmful*" argument by Hartford should be rejected.

20       **B.    The Numbers of Reviews Performed and Payments Made Would Not
21             Give Competitors An Advantage Because They Cannot Reverse Engineer
              Specific Payments or Rates.**

22       The numbers Hartford disclosed, while shocking on their face, are not trade secrets. This

23   is because they would not enable a competitor to reverse engineer how much Hartford pays

24   for reviews, how much it pays reviewers for their time, or even whether the reviews are

25   performed under an hourly or flat fee agreement.

26       Initially, the cost of reviews appears to vary based on whether the vendor is asked for an

27   initial review or an addendum. Using Hartford's payments in *Kurth*, for example, a competitor

28

-10-

1  would not be able to determine from the average Hartford paid MES—$742.94 in 2007; and

2  $1,002.67 in 2009—how much it was paying for initial reviews, first addenda, or second or

3  third addenda. *Kurth*, 845 F.Supp.2d at 1096. Given that no competitor would gain any

4  advantage, Hartford cannot meet its burden to establish that the number of claims reviewed

5  and payments received are protectable trade secrets.

6        Additionally, the amounts Hartford paid for Franklin's filed reviews are not secret.

7  Indeed, her claim file includes—non-confidentially—ECN's and MLS's invoices. Thus, it is

8  no secret that Hartford paid ECN $1,000.00 for Dr. Marwah's and Dr. Hoenig's initial

9  reviews and paid $175.00 per addendum. *See* Exhibit 1. Nor is it a secret that Hartford paid

10  MLS $705.00 for Parillo's review. *See* Exhibit 2. Given that the specific amounts Hartford

11  paid are also not a trade secret, it follows that the gross, non-specific payments Hartford

12  made in 2020 and 2021 are not a trade secret.

13        Finally, the numbers do not disclose if there was a surcharge for excess medical records

14  or, if the work was performed on an hourly basis, the number of records reviewed.

15  Presumably, if an insured has 12,000 pages of medical records Hartford would be charged

16  more than if the insured had 200 pages of records. This further obfuscates any allegedly trade

17  secret information that could theoretically (but not actually) be gleaned from the gross

18  numbers.

19        **C.**    **The Numbers Are Likely Stale.**

20        Hartford's confidentiality designation is also weakened by the fact that the numbers are

21  two-plus years old and the amount Hartford pays for reviews changes rapidly. In *Kurth*, for

22  example, Hartford paid an average of $743 for each MES review in 2007. *Kurth*, 845

23  F.Supp.2d at 1096. In 2009, that changed to $1,002 per review. *Id.*

24        In *Caplan*, Hartford went from paying UDC $300 per hour for reviews to $225 pursuant

25  to a "volume discount type arrangement." *Caplan*, 544 F.Supp.2d 990. Given that Hartford

26  appears not to pay the same rate for more than a year or two, the staleness of its 2020 and

27  2021 payments to ECN and MLS further weighs against overriding the public's presumptive

28  right of access to judicial materials.

1

## V.     __Conclusion.__

2     Hartford cannot make the required "particularized showing" that "specific prejudice or

3 harm will result" if the number of reviews it received from ECN, MLS, and Drs. Parillo,

4 Marwah, and Hoenig in the years 2020 and 2021, and the amounts it paid for those reviews,

5 are not sealed. *San Jose Mercury News*, 187 F.3d at 1103; *Foltz*, 331 F.3d at 1130. Accordingly,

6 the Court should sustain Franklin's objection to Hartford's confidentiality designation and

7 hold that the information may not be sealed pursuant to the Court's *Stipulated Protective Order*.

8                                        DATED March 28, 2023,

9                                        LAW OFFICE OF PATRICK MAUSE, PLLC

10

11                              By: _s/ Patrick W. Mause_____
                                        Patrick W. Mause

12                                        Attorney for Plaintiff

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28